**JSA INC., Plaintiff,**

v.

**PINEWOOD MANOR, INC. and New England Baptist Council, Defendants.**

**Civ. No. 90–0097–P.**

United States District Court, D. Maine.

Jan. 7, 1991.

Jeffrey T. Edwards, Preti Falherty Beliveau & Pachios, Portland, Me., for plaintiff.

Walter May, Michael Duffy, Peabody & Arnold, Boston, Mass., Paul M. Boots, Norman Hanson & DeTroy, Portland, Me., for defendants.

## MEMORANDUM OF DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

Plaintiff, an architectural firm, brings this diversity action against its former clients, who have filed a demand for arbitration against Plaintiff with the American Arbitration Association. Relying on a "Release and Agreement" signed by all the parties on October 15, 1983, Plaintiff seeks a declaration that Defendants have released and discharged it from certain claims relating to its plans for a 50–unit residential facility in Old Orchard Beach, Maine. Plaintiff also requests an order enjoining Defendants from proceeding with arbitration of those claims. Alternatively, Plaintiff seeks a declaration that Defendant's claims are barred by the applicable statute of limitations.

The Court finds that genuine issues of material fact preclude the granting of Plaintiff's motion for summary judgment.

### I.

A motion for summary judgment must be granted if:

[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The Court of Appeals for the First Circuit recently articulated the legal standard to be applied in deciding motions for summary judgment:

[T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 [106 S.Ct. 2548, 2553, 91 L.Ed.2d 265] (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904 [96 S.Ct. 1495, 47 L.Ed.2d 754] (1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. *Anderson*, 477 U.S. at 248 [106 S.Ct. at 2510]; *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989). As the Supreme court has said:

[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson*, 477 U.S. at 249–59, 106 S.Ct. at 2510–16.

*Brennan v. Hendrigan*, 888 F.2d 189, 191–92 (1st Cir.1989).

Many of the relevant facts are not in dispute and are set forth as follows. On August 15, 1980, Plaintiff and Defendant Pinewood Manor, Inc. (Pinewood) entered into a contract for architectural services. Pursuant to the contract, Plaintiff agreed to provide architectural services in connec-

tion with the design and construction of Pinewood Manor, a 50–unit elderly housing facility in Old Orchard Beach, Maine. Construction of the project was substantially completed by October 7, 1981 and the facility was completely occupied by the spring of 1982.

The August 15, 1980 contract between the parties contains an arbitration clause which provides that "[a]ll claims, disputes and other matters in question between the parties to this Agreement, arising out of or relating to this Agreement or breach thereof, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise...."

During the winter of 1981 to 1982, representatives of Pinewood complained to Plaintiff that the windows specified by Plaintiff were inadequate and that some areas of the facility lacked sufficient heating. Subsequently, on October 15, 1983, the parties entered into a "Release and Agreement," the intent of which was "to resolve all problems (known and which by the present exercise of reasonable diligence could now be known) in connection with the rendering by JSA of architectural services; and to limit the further extent of JSA's liability for future claims by Pinewood." In exchange for the release by Defendants of most claims it may have had against Plaintiff, Plaintiff agreed to pay for the procurement and installation of additional heating elements in the project.

The release and agreement signed by the parties provides:

In consideration for JSA's commencing the undertakings set forth in the Proposal, Pinewood hereby releases and discharges JSA, its officers, employees, agents, servants, insurers, consultants, contractors, subcontractors and other representatives from all debts, demands, actions, causes of actions, suits, sum and sums of money, covenants, contracts, controversies, agreements, promises, omissions, damages, executions and liabilities as follows:

(a) all claims of every nature and description whatsoever both in LAW and EQUITY arising out of or in connection with the heating system at the project; and

(b) all claims of every nature and description whatsoever, in LAW and EQUITY arising out of or in connection with the specifications for, selection and installation of windows (Universal Aluminum Thermo Bloc) in the housing development which windows are presently the subject of claims by Pinewood against the manufacturer; and in connection herewith Pinewood shall indemnify JSA from any costs and any judgment which may be adjudged due from JSA on account of said windows, and Pinewood, at its expense and through its counsel shall defend and keep indemnified JSA in any proceedings or lawsuits arising out of the defective windows commenced by Pinewood or by Pinewood's mortgagee (United States of America, Secretary of Housing and Urban Development) in which JSA may be named a party; and

(c) all other claims of every nature and description whatsoever, in LAW and EQUITY, *except for matters of which Pinewood is not aware and by the exercise of reasonable diligence Pinewood could not now be aware arising out of the Agreement for Architectural Services, and which matters (1) would involve the structural integrity of the project, or (2) which matters may have resulted from the gross negligence by JSA. The express intent of this subparagraph (c) is to eliminate all possible claims or demands of Pinewood other than as set forth in this subparagraph (c).*

In addition to the heating and window problems at Pinewood Manor, Pinewood received complaints from residents about rainwater running down the exterior walls and freezing on the windows. These complaints were received as early as March 2, 1982. Pinewood also filled out maintenance reports of water leakage on five occasions in 1982 (January 5, February 3, twice on June 2, and July 1), on three occasions in 1983 (March 2, April 4 and December 12) and on four occasions in 1984

(February 29, May 1, June 1, and September 17). Pinewood was also aware, within the first year after completion of the complex, that rainwater ran down the sides of the complex, and that shingles on the exterior walls remained wet for three to five days after a rainstorm.

Sometime prior to August 1988, employees at Pinewood Manor noticed that large leaks occurred near patio windows during rainstorms. In August 1988, officials at Pinewood, believing spaces between the windows and frames were causing the leaks, took corrective action. When workmen removed shingles around the windows, however, they discovered extensive saturation of the facility's internal supporting structure.

On or about August 9, 1989, Defendant Pinewood filed a Demand for Arbitration against Plaintiff with the American Arbitration Association. In that filing Pinewood asserts that it

> seeks to recover damages sustained as a result of the negligence of [Plaintiff] in the performance of its obligations under the contract. In essence, it is the claimant's position that [Plaintiff] was negligent in its design of the Pinewood Manor facility and as a result of this negligence, the claimant has sustained damages to its facility due to moisture problems, water infiltration and rot.

## II.

In this action, Plaintiff seeks an order staying the arbitration and a declaration that Defendants' claims are barred by the "Release and Agreement" which all parties signed. In that agreement, Defendants released most legal claims they may have asserted against Plaintiff arising out of Plaintiff's architectural services, excepting only a limited class of claims. That limited class includes only "matters of which Pinewood was not aware [as of October 15, 1983] and which by the exercise of reasonable diligence could not [then have been] aware arising out of the Agreement for Architectural Services," *and* which "(a) involve the structural integrity of the project or (b) which matters may have resulted from gross negligence by JSA."

Plaintiff argues that Defendants' claims do not fall within the exception quoted above because Defendants, prior to the execution of the "Release and Agreement," allegedly were aware or that with reasonable diligence could have been aware that rainwater was running down the exterior walls of the project and that there were numerous leaks into the structure. Plaintiff also argues that the alleged design defect does not involve the structural integrity of the project.

The Court finds genuine issues of material fact with respect to whether Defendants were aware of the alleged design defect. Although there is ample evidence in the record to suggest that Defendants may have had notice of the alleged design defect of which they now complain, the Court cannot conclude as a matter of law that they were aware of it. The record demonstrates that Defendants were aware of some leakage problems and that rainwater ran down the sides of the project. The record does not make clear, however, that the leaks known to Defendants were caused by the alleged design defect by Plaintiff, that those leaks caused the structural damage of which Defendants now complain, or that Defendants were aware that the leaks were allowing water to saturate the project's interior structural supports. Moreover, a genuine issue of material fact exists with respect to whether the claim Defendants now seek to have arbitrated "involves the structural integrity" of the project.

Pinewood does not dispute that it received complaints of leaks prior to the execution of the "Release and Agreement," and indeed the record shows that Pinewood filled out seven maintenance reports of leaks prior to the October 15, 1983 "Release and Agreement." Pinewood claims, however, that the leaks were due to construction errors that were repaired by its maintenance crew or by the construction contractor.

Plaintiff deposed Gilbert Beal, the Pinewood employee in charge of maintenance at

Pinewood Manor, who testified that the January 5, 1982 leak involved inadequate flashing between the roof and sidewall (a construction error), and not infiltration through the shingles. Beal also testified that the February 3, 1982 report involved only ice buildup on the window, not water leakage or infiltration, and the report itself does not indicate a leakage problem. Beal had no recollection of the June 2, 1982 report, which indicates the existence of a "leak over patio doors" in unit 304 that was corrected when Beal "caulk[ed] around and under [the] door." The record leaves the Court in doubt as to the relation of unit 304 to the alleged water damage to internal structural supports. Furthermore, that maintenance report could be construed as describing leakage between the window and the window frame, rather than a leak through the shingles as Defendants claim is the design defect. Beal testified further that the June 2, 1982 report of a leak in a corridor near unit 102, which he repaired by placing cement on the roof, is "nowhere near" the project's later water problems. Beal testified that the July 1, 1982 leak was repaired by the construction contractor, pursuant to a one-year oral warranty of its work, which installed a wooden strip below the patio doors where there was a crack or gash. At the same time, the contractor removed exterior shingles above the doors, installed new flashing, and replaced the shingles. The fact that the contractor remedied the reported problem pursuant to a warranty of its work suggests that the leak may have been caused by its faulty construction work, not by a design defect.

With respect to the March 2, 1983 report of a leak in the project's attic, Beal testified that he initially suspected that the leak originated from a faulty sprinkler. An investigation of the sprinkler revealed that explanation to be incorrect. On two subsequent occasions, Beal observed the roof during rainstorms in an attempt to identify the source of the leak. He was not successful. The problem persisted and resulted in the reported leak of April 4, 1983. On that occasion, the water caused damage to the project's interior dining-room wall, which required repair.

These last two reports provide Plaintiff with the strongest support for summary judgment. Defendants, however, have submitted the affidavit of a construction consultant they retained to inspect the water damage at Pinewood Manor. The affiant states that, in his opinion, the water damage to the structural members is not due to any identifiable leaks, but is due to the infiltration of water through the project's shingles. It is not clear to the Court whether the unidentified leaks described above were caused by infiltration through the shingles or from some other source, or whether those leaks caused the saturation problems which are the subject of Pinewood's demand for arbitration. The present state of the record makes summary judgment on this issue inappropriate.

The Court also finds that a genuine issue of material fact exists as to whether Defendants, "by the exercise of reasonable diligence," could have known of the alleged design defects which resulted in water damage to Pinewood manor's internal supporting structure. Whether reasonable diligence could have revealed the alleged design defect is a question of fact, and Plaintiff has not demonstrated that there exists no evidence to support Defendants' case. The numerous reported leaks at Pinewood Manor, especially those of March 2 and April 4, 1983, suggest that Defendants were put on notice of a potential water infiltration problem; reasonable diligence may have required a greater degree of investigation which may have revealed the full extent of the problem. However, the Administrator of Pinewood Manor, David H. Howe, testified that a representative of Plaintiff had assured him, prior to the execution of the release, that the accumulated snow on the balconies and against the patio windows posed no potential water infiltration problem. Moreover, Howe testified at his deposition that he conducted an investigation with Gilbert Beal at approximately the same time as the execution of the "Release and Agreement," and that they found no problems. A reasonable jury could conclude, based on the proffered proof, that reasonable diligence did not require height-

ened inquiry into the water infiltration problem; alternatively, a jury could conclude that such an inquiry would not have revealed the alleged design defect. The presence of these unresolved issues of fact preclude the granting of Plaintiff's motion for summary judgment.

The Court also finds that a genuine issue of material fact exists as to whether the alleged design defect "involves the structural integrity" of the complex. Defendant's construction consultant states in his affidavit that, in his opinion and based on his investigation of the water damage at Pinewood Manor, the water damage affects the structural integrity of the facility. That assertion generates a genuine issue of material fact that precludes summary judgment.[1]

Accordingly, it is *ORDERED* that Plaintiff's Motion for Summary Judgement be, and it is hereby, *DENIED*.

---

1. Plaintiff also argues that Defendants' claims are barred by the statute of limitations. The applicable section provides in pertinent part:

All civil actions for malpractice or professional negligence against architects or engineers duly licensed or registered under Title 32 shall be commenced within four years after

such malpractice or negligence is discovered....

14 M.R.S.A. § 752–A.

A genuine issue of material fact exists as to when the alleged malpractice was discovered, and thus summary judgment on this issue is not appropriate.