Doel R. GARCIA and Money Concepts
International of the Caribbean,
Inc., Plaintiffs,

v.

AMERICAN HERITAGE LIFE
INSURANCE COMPANY,
Defendant.

FIRST FEDERAL SAVINGS BANK

v.

MONEY CONCEPTS INTERNATIONAL,
INC.

Civ. Nos. 86–1200 (JP), 86–1462 (JP).

United States District Court,
D. Puerto Rico.

Aug. 28, 1991.

Nicolás Delgado Figueroa, Santurce, P.R., Thomas N. Crawford, and Frederick T. Kuykendall, III, Cooper, Mitch, Crawford, Kuykendall & Whatley, Birmingham, Ala., for plaintiffs.

John M. García and Carlos R. Ríos, Hato Rey, P.R., for defendant.

William Santiago Sastre, Santurce, P.R., for First Federal Sav.

## OPINION AND ORDER

PIERAS, District Judge.

The Court has before it defendant's motion for summary judgment based on Lack of Subject Matter Jurisdiction, as well as Lack of Privity between plaintiff Doel García and defendant. For the reasons stated below, we deny the defendant's motions.

## I. SUMMARY OF THE CASE

This is a set of consolidated cases centering on the business of Money Concepts International of the Caribbean ("MCIC"). The original complaint in the earlier case was filed on July 18, 1986, and the amended complaint was filed on February 20, 1987. The plaintiffs in this case are Mr. Doel García ("García") and MCIC. García claims to be a citizen of the Commonwealth of Puerto Rico, at present, and at the time of the filing of both complaints. MCIC is a domestic corporation, registered in the Department of State of the Commonwealth of Puerto Rico with its principal place of business in Puerto Rico. The defendant, American Heritage Life Insurance Co. ("Heritage"), is incorporated in Jacksonville, Florida, and has its principal place of business in Florida.

In January of 1982, MCIC entered into a franchise agreement with Money Concepts International, Inc. ("International"), in which it agreed to pay fees to enter into a commercial relationship, as franchisee and independent contractor, with International, a Nevada corporation with its principal place of business in Florida. Plaintiffs' Supplemental Memorandum, Docket Entry No. 69, Exhibit B at 1. As part of this agreement, International granted MCIC the right to conduct marketing activities for all of its products subject to the agreement and contained in an addendum to said agreement. *Id.* at 3. The agreement also provided that International would recruit and train for appointment and licensing as agents, those agents recruited by MCIC for specific companies. The affiliated companies would appoint and license, in writing, on their own forms, MCIC's chosen agents. *Id.* at 4, 14. Pursuant to the agreement, MCIC would remit directly to the insurance company the gross amount of all premium or other payments received by MCIC's agents for or on behalf of that company. *Id.* at 5, 14–15. The territory agreement between these companies states that International authorized MCIC to market its products in the territory of "The Caribbean."[1] *Id.* at 24.

Doel García was one of the MCIC's designated agents for defendant Heritage.[2] García entered into an agreement with American Heritage, requesting Heritage to apply for his license to represent it in Puerto Rico and the Virgin Islands as an insurance agent, and consenting to be bound by the conditions set forth in the agreement. *Id.* Exhibit C. The Agreement provided that García remit to International or Heritage all monies or securities he received on behalf of Heritage as full or partial payments of first or renewal premiums; the document specifically states that García is not an employee, partner joint venturer or associate of American Heritage. *Id.* The office of the Insurance Commissioner is-

---

1. According to the Amended complaint, MCIC sold defendant's insurance policies in Puerto Rico and the Virgin Islands from 1982 to 1984.

2. Mr. García was also the president of MCIC and owned about thirty four percent of the stock of MCIC. Deposition of plaintiff Doel García, January 10, 1989, Docket Entry No. 73 at 39.

sued a license to García and designated him as General Agent for American Heritage. *Id.* Exhibits D–1, D–2, E. Also, Heritage designated MCIC as its Agent for Service of Process in Puerto Rico. *Id.* Exhibit E.

According to the amended complaint, the business operation, good will, continued economic enterprise, and financial gains of MCIC were undermined and subsequently destroyed by the failure of Heritage to adequately deliver services related to the insurance business produced by MCIC. García and MCIC allege that defendant's acts and omissions, such as not issuing policies, not mailing premium notices, and not processing salesmen commissions, caused MCIC to suffer cancelation of the insurance business when policy-owners lost confidence in Heritage.

In addition, plaintiff García claims that, as a result of the grave inconveniences, clerical problems, negligence, and failures on the part of Heritage to take timely corrective measures of its operations, his personal investment, credit record, professional reputation, and interest in continuing the effective economic operation of MCIC were gravely affected. The Amended Complaint alleges that the acts and omissions of Heritage caused Mr. García's losses. García also claims that, as a direct result of defendant's actions, he has been exposed to public ridicule, and his credibility in the insurance community has been affected. Because of defendant's actions, he was unable to meet certain financial obligations, thus culminating in various creditors filing complaints against him. Finally, Mr. García claims that as a result of the above-mentioned allegations, his marriage was "severely deteriorated." Plaintiffs seek damages in the total sum of Five Million Dollars, plus costs and attorneys' fees.

Heritage has filed a counterclaim against the plaintiff, claiming that the general agent of Heritage, International, entered into an agency contract with MCIC to sell insurance policies written by Heritage. According to the counterclaim, in order to comply with local Puerto Rico regulations, Heritage requested the Commissioner of

Insurance of Puerto Rico to issue a license to García, so that he would be entitled to receive a commission. García had a license to act as a general agent of Heritage from June 9, 1981, to June 30, 1982. On July 1, 1982, he was one of the two required licensed agents acting on behalf of MCIC, who became licensed agent of Heritage. Due to the payment of advance commissions to International for business generated by MCIC, International created a debt to Heritage. This debt was secured by future commissions payable on the insurance policies written by International, which were, at the end of 1988, amounts totalling $100,-004.72. The counterclaim declares that should Heritage be found liable to either of the plaintiffs, it should be entitled to collect or offset amounts owed by plaintiff to International, and in turn Heritage.

As earlier stated, this is a consolidated case. First Federal Savings Bank ("First Federal"), the plaintiff in the related case, *First Federal Savings Bank v. Money Concepts International, Inc.,* Civ. No. 86–1462 (JP), claims that MCIC subscribed to a promissory note through its President, Doel García, for the principal amount of $75,000.00 from First Federal. García guaranteed payment of the promissory note with his personal signature and a personal assignment from MCIC and Doel García of earned and deferred commissions due from insurance companies arising out of policies sold by García on behalf of MCIC and Doel García. This assignment was executed by the First Federal, defendant International through its Chairman and President John P. Walsh, and Doel García on April 18, 1984. MCIC defaulted on the loan, and pursuant to the arrangement, First Federal received $16,387.58 from the defendant, including commissions from various companies. First Federal alleges that the defendant has failed to comply with the terms of the assignment and has not paid the balance due. The complaint avers that International misrepresented material facts, thereby inducing First Federal to enter into the credit transaction.

International counters that although it is obligated to pay the plaintiff the commissions it received from insurance companies

due to Doel García and MCIC, it has not received any commissions above the $16,-387.58. The defendant has raised the defense that the payment in the amount of $16,387.58 was in full discharge of its obligation under the assignment acknowledgment.

Heritage has filed several motions to dismiss the complaint based on lack of subject matter jurisdiction as well as lack of privity between the plaintiff García and Heritage. As both the García and MCIC and Heritage have submitted documents for the Court's consideration outside of the pleadings, the motions to dismiss shall be treated as motions for summary judgment pursuant to Federal Rules of Civil Procedure 12(c).[3]

## II. SUMMARY JUDGMENT—THE LEGAL STANDARD

A motion for summary judgment is appropriately granted when:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

■ In a summary judgment motion, the movant bears the burden of demonstrating "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2254, 91 L.Ed.2d 265 (1986).

■ The nonmovant then bears the burden of establishing the existence of a genuine material issue. *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989). However, the nonmovant may not rest upon mere allegations or denial of the pleadings; it must respond, by affidavits or other supporting evidence, setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

## III. DIVERSITY OF CITIZENSHIP

Defendant American Heritage alleges that the plaintiff Doel García was a resident of Florida when the complaint was filed in July of 1986, thus destroying diversity of citizenship subject matter jurisdiction. García claims to be a citizen of the Commonwealth of Puerto Rico at present, and at the time of the filing of both complaints. After considering all the circumstances in this case, we find García a citizen of Puerto Rico.

The applicable statute in effect when plaintiff filed this lawsuit provided, in pertinent part, that

> The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000.00, exclusive of interest and costs, and is between—
>
> (1) citizens of different States.

28 U.S.C. § 1332(a).

■ Whether federal diversity exists is determined by the citizenship of the parties at the time the action is commenced—the time of the filing of the complaint. *Smith v. Sperling*, 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1114 n. 1, 1 L.Ed.2d 1205, 1209 n. 1 (1957). State citizenship for purposes of determining diversity is frequently equated with domicile. *Hawes v. Club Ecuestre El Comandante*, 598 F.2d 698, 701 (1st Cir.1979). "A person's domicile 'is the place where he has his true, fixed home and principal establishment, and to which, whenever he is absent, he has the *intention* of returning.'" *Rodriguez–Diaz v. Sierra–Martinez*, 853 F.2d 1027, 1029 (1st Cir.1988) (emphasis added and citation omitted). A strong presumption exists in favor of an established domicile against an allegedly newly acquired one. The law presumes that a domicile once established continues unless and until a new domicile is acquired. *White v. All America Cable & Radio, Inc.*, 642 F.Supp. 69, 72 (D.P.R.1986), *summary judgment granted in part*, 656 F.Supp. 1168 (D.P.R.1987).

---

**3.** Federal Rules of Civil Procedure 12(c) states that, "[i]f, on a motion for judgment on the pleadings, matters outside of the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...."

Consequently, the party attempting to show a change in domicile bears a heavier burden than the party claiming retention of an existing or former domicile. 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 1312 (1984) (Supp.1991) [hereinafter Wright and Miller].

■ The test for establishing a change in domicile involves two elements: (1) physical presence at the new location with (2) an intention to remain there indefinitely. 13B Wright and Miller § 3613. *See also Valedón Martinez v. Hospital Presbiteriano de la Comunidad*, 806 F.2d 1128, 1132 (1st Cir.1986). Thus, "[t]here must be an actual, not pretended, change of domicil [sic] ... the removal must be 'a real one ... and not merely ostensible.' [Citation omitted.] The *intention and the act must concur* in order to effect such a change of domicil as constitutes a change of citizenship." *Morris v. Gilmer*, 129 U.S. 315, 328, 9 S.Ct. 289, 293, 32 L.Ed. 690, 695 (1889) (emphasis added).

■ When the domicile of a party is in doubt, its determination requires an evaluation of all the circumstances of the case. *Krasnov v. Dinan*, 465 F.2d 1298 (3d Cir. 1972). Factors frequently taken into account include: current residence; voting registration and voting practices; location of personal and real property; location of brokerage and bank accounts; membership in unions, fraternal organizations, churches, clubs, and other associations; place of employment or business; driver's license and automobile registration; payment of taxes; as well as other factors. No single factor is conclusive. 13B Wright and Miller § 3612.

■ In this case, García moved from Puerto Rico to Florida in 1984, and claimed that the reason he did so was to pursue his employment with International. *See* Declaration of Doel García, Docket Entry No. 81. He claims that he never had the objective of moving permanently from Puerto Rico. He refers to the fact that he had *animus revertendi* (the intention of returning) and always planned to return to Puerto Rico. *Id.* According to his deposition of January

10, 1989, at the time of the filing of the complaint, plaintiff owned no real or personal property in either Puerto Rico or in Florida. He had an office in Florida, and he lived in already furnished apartments in Florida; these were his postal addresses. Whenever he went to Puerto Rico, he stayed with close relatives or at hotels. García belonged to fraternal organizations in the states of Missouri and Florida. In 1986, he filed tax returns in both Florida and Puerto Rico. He showed his local address to be that of his son in Miramar. Also, plaintiff states he has always voted in Puerto Rico, has not registered to vote in Florida, and has not made a transfer or change of address with the Election Commission. His family doctor, Dr. Rafael Burgos Calderón, practices in Puerto Rico and he visits him about once a year, and his other physician practices in Manatí, Puerto Rico, even though he visited a dentist and eye doctor in Florida, and had a Florida group insurance policy from International. Plaintiff's family remains in Puerto Rico, and he retained a Puerto Rico driver's license. García maintains that he is a citizen of the Commonwealth of Puerto Rico, and his only involvement in the state of Florida was due to his employment. Given the above-mentioned factors, plaintiff's clear intention to remain domiciled in Puerto Rico after he moved in 1984, and the strong presumption in favor of an already established domicile, we conclude that the plaintiff's "change of domicile ... was merely ostensible." His intention to change domicile and the act of moving to Florida did not concur in order to result in a change of domicile sufficient to constitute a change of citizenship for purposes of diversity. *Morris*, 129 U.S. 315, 9 S.Ct. 289, 32 L.Ed. 690.

Therefore, the Court denies the motion for summary judgment based on lack of subject matter jurisdiction, finding that complete diversity of citizenship exists in this case: García is a citizen of Puerto Rico; MCIC is a domestic corporation, duly registered in the Department of State of the Commonwealth of Puerto Rico, with its principal place of business in Puerto Rico and as such, it is a citizen of the Common-

wealth of Puerto Rico;[4] defendant American Heritage is incorporated in Jacksonville, Florida, and has its principal place of business in Florida. Thus, Heritage is a citizen of the state of Florida.

## IV. PRIVITY OF CONTRACT

The defendant also argues that plaintiff García has failed to state a cause of action upon which relief can be granted because as an agent who was compelled to relinquish his license to MCIC under Puerto Rico law, he can only act through the corporation. According to the defendant, no contract can exist between García and Heritage because he had rendered his agent's license to MCIC as required by the Insurance Code of Puerto Rico, and consequently, cannot claim any rights solely derived by one who has a license. Heritage further argues that there is no contract between it and Doel García, so that the action should be dismissed for lack of privity.[5] The plaintiff counters that the various contracts between Heritage, MCIC and International, as well as the extensive direct course of dealings between the Heritage, MCIC and García expressly and impliedly established the required juridical relationships between the plaintiffs and Heritage. Also, the plaintiff in the consolidated case, First Federal, argues that Mr. García and his company were serving as agents of Heritage for purposes of selling insurance in Puerto Rico; therefore, it was reasonably foreseeable that Heritage's alleged misperformance of contractual obligations

with International would have affected the agents in Puerto Rico.

The license agreement between García and the Heritage, governed by Puerto Rico law, states that

the [c]ompany [Heritage] has no obligation, to me for commissions, expense allowance or any form of compensation whatsoever in connection with the services performed and expenses incurred by me in the solicitation of applications for insurance issued by the Company, it being expressly understood that I am under direct contract with Money Concepts Int., Inc. who has agreed to compensate me for such services ... I shall not obligate the Company nor incur expense in its behalf in any money whatsoever....[6]

Plaintiffs' Supplemental Memorandum, Docket Entry 69, Exhibit C.

In the franchise agreement between International and MCIC, International agrees that it will pay to the Franchisee, MCIC, compensation for services:

*Payments.* MCI [International] will pay to Franchisee as full compensation for its services under this Agreement, the amount shown in the compensation schedules attached hereto and incorporated by reference herein. MCI shall have directly paid to Franchisee all compensation due to Franchisee in connection with business produced by Franchisee pursuant to this Agreement, for products marketed by MCI through Franchisee. All such payments will be

---

**4.** Section (c)(1) of 28 U.S.C. § 1332 provides that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business...."

**5.** Defendant has filed an alternative motion for arbitration. This motion must be denied, as the arbitration clause defendants rely upon was part of the Marketing Agreement between defendant and International, and is limited to any dispute arising from that contractual relationship. Moreover, as plaintiffs point out, that agreement specifically contemplates suits by third parties, such as the instant case, and provides that "In the event either of the parties hereto shall become a party defendant in any action commenced by a person or entity other than a party to this Agreement, such party shall

not be required to submit to arbitration any aspect of such litigation or action, but rather shall proceed in the forum in which such action is commended [sic] until it is finally resolved or an agreed settlement is reached and each party shall be free to act in his or its own best interests with respect to such litigation or action." Plaintiff's Supplemental Memorandum, Docket Entry No. 69, Marketing Agreement, Exhibit A at 14.

**6.** Another "License Only Agreement" was signed by Mr. García on December 4, 1981. This agreement provides that Mr. García is under direct contract with his "Corporate Affiliate MCI of the Caribbean, Inc. who has agreed to compensate me for such services...." Defendant's Motion for Summary Judgment, Docket Entry No. 49, Exhibit II.

derived from MCI Marketing Agreements with Companies, and other products of MCI. These payments whether from MCI or the Companies directly to Franchisee, shall in no event be construed as making Franchisee an employee of MCI or the Companies.

*Id.* Exhibit B at 8.

Also, the franchise agreement states that the franchisee, MCIC, shall make ,any and all claims, complaints and/or inquiries about a financial services product, directly to the company—in this case, Heritage—whose product is involved. The company shall then handle directly all these types of claims, complaints and/or inquiries according to their own procedures. All customer complaints, insurance department inquiries and other communications relating to policies, sales, solicitations or any general question related to a product of an affiliated company should be reported immediately by the franchisee to the specific company and to International. *Id.* at 14. This agreement is also governed by Puerto Rico law. *Id.* at 21.

Finally, in the Marketing Agreement between International and defendant American Heritage, no direct definition of "Producer" is provided, but the contract states that Heritage shall retain the right to reject any individual or entity recruited by International as an "MCI Producer", or to terminate the license and Licensing Agreement of any MCI Producer established pursuant to the Agreement. Plaintiff's Supplemental Memorandum, Docket Entry No. 69, Exhibit A at 2. It also requires International to use its best efforts to carry out the Agreement and actively seek and obtain qualified and experienced individuals, or organizations, to become "MCI Producers". International and its Producers are obligated to conduct and operate their activities, so as not to adversely affect the business, good standing, or reputation of Heritage, and must keep in force all licenses and permits required for the conduct of their business, and fully comply with all laws and regulations applicable to the conduct of their business. *Id.* Further, Heritage agreed to "indemnify and save MCI [International] harmless from all losses, expenses, costs, damages, and liabilities resulting from acts, transactions or omissions of ... [Heritage] or its employees." *Id.* at 3. However, under the terms of the contract, International is to receive, and Heritage is to pay a gross commission based on premiums paid to and accepted by Heritage on its policies. The contract further provides that Heritage is under no obligation to pay any sum or sums of money whatsoever to MCI Producers (MCIC and García) for policies submitted to Heritage by MCI Producers; any such obligations are solely International's. *Id.* at 4. This agreement is governed by Florida law.

Clearly, this three-tiered framework of contracts contemplates contact between the franchisee, MCIC, and the insurance company, Heritage. Moreover, part of the plaintiffs' claim alleges that Heritage failed to adequately deliver services related to the insurance business produced by MCIC, and included in this contention is the failure to issue policies and mail premium notices.[7] This claim encompasses the type of complaint related to policies, sales, and solicitations of the financial service products of Heritage, articulated in the provisions of Franchise Agreement and the Marketing Agreement quoted above, as the franchisee/producer, MCIC, is to make all such complaints to the insurance company directly, and Heritage is to hold Interna-

---

**7.** We note that plaintiffs have submitted a copy of a letter from John P. Walsh, President of International Financial Services, Inc., to T. O'Neill Douglas, Sr. Vice President at Heritage. In this letter, Mr. Walsh states that "employees of American Heritage Life repeatedly interposed themselves between us and our franchisees in the conduct of business. We would consistently learn of these visits and conversations after the fact and it effectively took control of the relationship out of our hands ... This control prob-

lem was compounded by the massive errors and troubles created by the chaotic administrative situation that existed at the American Heritage Life home offices over and extended period of time. We have file upon file that documents these problems that were extremely costly to us in lost business ... lost franchisees ... lost representatives ... and lost opportunities in both Puerto Rico and other areas to a lesser degree." Plaintiffs' Supplemental Memorandum, Docket Entry No. 69, Exhibit F.

tional harmless for all losses, expenses, costs damages and liabilities resulting from the acts or omissions of Heritage or its employees.

After carefully examining the memoranda submitted to the Court, the Court ORDERS the parties to further brief the following issues raised but not addressed by the defendant's motions and plaintiffs' responses: the issue of privity, as applied to the Puerto Rico Civil Code, and Florida law, and the three-tiered framework of contracts in the instant case; the issue of third-party beneficiary, and whether plaintiffs, if not a direct party to the Marketing Agreement between International and Heritage, were third-party beneficiaries, and whether such determination is to be made according to Florida law, which governs said contract; the issue of MCIC's and García's alleged inability to be an agent of Heritage, under Puerto Rico law, and therefore sue the alleged principal, Heritage, for indemnification for losses and damages under Article 1631 of the Civil Code, 31 L.P.R.A. § 4463.[8] In order to aid the Court in finally resolving these issues, the parties are reminded to include any and all relevant case citations and references to Florida and Puerto Rico laws, explaining why Florida or Puerto Rico law would apply in determining a certain issue. The parties shall have ten days to file said legal memoranda.

## V. CONCLUSION

Wherefore, in view of the foregoing, defendant's motion for summary judgment based on lack of subject matter jurisdiction and the alternative motion for arbitration are DENIED.

Pretrial date remains set for September 5, 1991. The Court notes that no jury trial has been requested in this case, although the Court mistakenly stated in the November 28, 1990, Status Conference, Docket Entry No. 80, that jury instructions were to be submitted. Therefore, the September 23, 1991, will be a bench trial.

IT IS SO ORDERED.

---

**8.** This law provides that "[t]he principal must also indemnify the agent for all losses and damages he may incur in complying with the agency, without fault nor imprudence on the part of said agent." In Spanish, this provision reads, "Debe también el mandante indemnizar al mandatario de todos los daños y perjuicios que le haya causado el cumplimiento del mandato, sin culpa ni imprudencia del mismo mandatario."