**Robert BRENNAN, Plaintiff, Appellant,**

v.

**Roderick HENDRIGAN, et al.,
Defendants, Appellees.**

No. 89–1214.

United States Court of Appeals,
First Circuit.

Heard Sept. 13, 1989.
Decided Oct. 27, 1989.

Michael J. Conley, for plaintiff, appellant.

Brian Rogal, with whom Timothy M. Burke was on brief, for defendants, appellees Roderick Hendrigan and Gary Walsh.

Samuel Leiter, with whom Norman Holtz, Holtz and Gilman, P.C., Richard L. Barry, Jr., and Olivieri, Truttman, Barry & Casey were on brief for remaining appellees.

Before TORRUELLA, SELYA and MAYER *, Circuit Judges.

SELYA, Circuit Judge.

There is presented for our consumption an appeal from an order of the United States District Court for the District of Massachusetts granting summary judgment for all defendants in this civil rights action. After fully digesting the record, we have found plaintiff's assignments of error to be uniformly unnourishing. We therefore affirm.

## I. BACKGROUND

Although many of the details and nuances are controverted, the factual predicate underlying this suit is, for the most part, undisputed. We set forth that background in a manner consistent with the protocol of Fed.R.Civ.P. 56, described *infra.*

Plaintiff-appellant Robert Brennan was hired as a correctional officer at the Middlesex County House of Correction in Billerica, Massachusetts on September 1, 1982. His appointment was subject to a one-year probationary period. During the year, an inmate told prison officials that Brennan was trafficking with convicts, bartering drugs for jewelry. On July 6, 1983,

* Of the Federal Circuit, sitting by designation.

a "sting" operation was mounted, albeit clumsily. After alerting the state police, prison officials supplied their informant with some baubles to be offered to plaintiff as part of an illegal exchange. Shortly thereafter, the inmate reported that Brennan had risen to the bait, taken the jewelry, and agreed to the bargain.

The trap snapped shut—a bit prematurely, as matters turned out. Three prison officials (Gallant, the prison's security chief, and two guards, Spellisey and Roark) approached plaintiff's duty station and requested that he accompany them to an office within the prison complex. Once there, Brennan was instructed to empty his pockets. When he did so, the jewelry was found. Brennan was searched and told that he would be charged criminally. He alleges that he was handled ungently during the episode; his shirt pocket was ripped and his wallet "torn apart." Plaintiff claims, and defendants deny, that he satisfactorily explained the situation. *See infra* n. 5. The prison officials claim, and Brennan denies, that he admitted guilt. Before the session ended, the officers took Brennan's car keys (which had been in his pocket) and conducted a consensual, but warrantless, search of his automobile. At one point, Aubuchon, the prison's personnel director, entered the office and terminated plaintiff's employment.

Thereafter, two state troopers (who had been briefed earlier and were waiting in their cruiser) came into the room. Before interviewing Brennan, the troopers were told by prison officials that Brennan had been discharged after admitting (1) that he had received jewelry from an inmate, intending to swap money and marijuana in exchange; and (2) that, on another occasion, he had brought illegal drugs into the facility for prisoner use. The troopers claim, and Brennan denies, that during the interview, Brennan admitted to them that he intended to remove the jewelry from the penitentiary, sell it, and pay the inmate for stealing it. At some point after Brennan was cashiered, the prison superintendent

(Quealy) was brought up to speed. Later that evening, the superintendent and his deputy (Ryan) spoke to the duty shift concerning plaintiff's dismissal.

We need only offer a decurtate account of the remaining events. Brennan was charged, found guilty of receiving illicit articles with intent to convey by a judge in Lowell District Court, appealed, claimed a de novo trial by jury, and was eventually acquitted.

## II. PROCEEDINGS BELOW

Following acquittal, plaintiff brought the instant action against the Middlesex County Sheriff, six persons employed at Billerica (officers), and two Massachusetts state troopers (troopers).[1] His complaint contained five counts, all of which drew upon the same 38-paragraph narrative of events. Count II was dismissed early on, and is not before us. We limn the remaining statements of claim:

A. Count I, brought under 42 U.S.C. § 1983 (1982), alleged in substance that, on various dates from and after July 6, the individual defendants, acting under color of law and in a conspiratorial fashion, deprived Brennan of various rights secured by the federal Constitution.

B. Count III, a pendent state-law claim, asserted that the described conduct violated the Massachusetts Civil Rights Act, Mass.Gen.L. ch. 12, § 11I (1986).

C. Count IV alleged that the Sheriff, qua employer, deprived Brennan of a constitutionally secured liberty interest by cashiering him without due process of law.

D. Count V, oblivious of any need for identifying theoretical roots, simply alleged that plaintiff had suffered emotional distress as a result of defendants' misconduct.

After completion of discovery, defendants—contending that there were no triable issues—moved for brevis disposition. The district court, in an ore tenus bench decision, obliged. Brennan appealed.

## III. THE APPLICABLE LEGAL STANDARD

A motion for summary judgment must be granted if:

[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Accordingly, the movant must adumbrate "an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both "material," in that it might affect the outcome of the litigation, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir.1975), cert. denied, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976), and "genuine," in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; Oliver v. Digital Equipment Corp., 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. "The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." Mack v. Great Atlantic and Pacific Tea Co., 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly

---

**1.** The Sheriff (nominally, Brennan's employer) was sued only in his official capacity. The six Billerica-based defendants, Gallant, Spellisey, Roark, Aubuchon, Quealy, and Ryan, were sued personally, as were the troopers (Roderick Hendrigan and Gary Walsh).

probative, summary judgment may be granted.

*Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

It is against this firmly-entrenched backdrop that we examine whether Brennan sustained his burden of establishing the existence of genuine, material fact issues with respect to any of his claims.

## IV. THE FOURTH AMENDMENT CLAIMS

We start with the claims encompassed by count I of plaintiff's complaint, pausing first to comment upon the doctrine of qualified immunity; and then proceeding to assess the reasonableness of defendants' conduct.

### A. *Qualified Immunity.*

State actors are entitled to qualified immunity from damages under section 1983 if they have performed discretionary functions falling within the scope of their authority and have done so in an objectively reasonable manner, measured by the state of the law at the time the conduct occurred. *Procunier v. Navarette,* 434 U.S. 555, 561–62, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978); *Unwin v. Campbell,* 863 F.2d 124, 128 (1st Cir.1988); *Brown v. Ponte,* 842 F.2d 16, 18 (1st Cir.1988); *Maldonado Santiago v. Velazquez Garcia,* 821 F.2d 822, 829–30 (1st Cir.1987); *Blackburn v. Snow,* 771 F.2d 556, 569 (1st Cir.1985). That is to say, officials are shielded from liability for such damages insofar as their behavior does not violate clearly established statutory or constitutional rights "of which a reasonable person would have known...." *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The test is an objective one: "the immunity inquiry focuses not on the official's subjective belief about his conduct, but on whether the belief he held was objectively unreasonable." *Blackburn,* 771 F.2d at 569.

When, as here, the defense of qualified immunity is raised, a plaintiff cannot sidestep it for summary judgment purposes merely by alleging that defendants uncar-

ingly transgressed his rights. *Anderson v. Creighton,* 483 U.S. 635, 640–41, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987). "[A]n allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). State actors must keep their behavior within the realm of reason; but, perfection is neither expected nor required. In the lexicon of qualified immunity, there is room for mistaken judgments. It follows that the reasonableness of a defendant's actions may be determined only by examining them in light of the particular circumstances known at the time the challenged conduct took place.

For an act to fall outside the scope of immunity, "the unlawfulness must be apparent ... in the light of pre-existing law.... The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039. Qualified immunity, then, does not protect reckless, plainly incompetent, or knowing violators of the law, *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096; but it offers a haven to many other state actors. Officials are immune unless the law clearly proscribed the actions they took. *Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984). This is as it should be: "Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

### B. *Reasonableness of Officers' Actions.*

■ As is evident from the foregoing, the qualified immunity inquiry reduces to a question of whether a reasonably competent official would likely have believed his actions vis-a-vis Brennan to be in accordance with the Constitution. We apply this

test first to the officers.[2]  To do so, it is necessary briefly to survey the state of the law, and then to review the attendant circumstances.  Because plaintiff has concentrated his fire on the fourth amendment (he has mentioned other theories in passing, but none merit discussion), we follow his lead.

The fourth amendment reaches stops and detentions short of arrest.  *United States v. Trullo,* 809 F.2d 108, 110 (1st Cir.), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987).  Yet, not every contact by a police officer implicates constitutional rights;  nor does every stop or detention require probable cause.  *See Lopez v. Aran,* 844 F.2d 898, 904–05 (1st Cir.1988);  *United States v. Ferreira,* 821 F.2d 1, 4 (1st Cir.1987);  *Trullo,* 809 F.2d at 110;  *United States v. Manchester,* 711 F.2d 458, 460 (1st Cir.1983).  Merely asking an individual to answer questions will not ordinarily violate the fourth amendment.  *See, e.g., INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984);  *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983);  *Manchester,* 711 F.2d at 460.  Where an individual is detained, the fourth amendment is more deeply implicated.  Nevertheless, the constitutional guarantee is violated only if the detention is unreasonable.  As we recently wrote:

> [W]here the stop and interrogation comprise more of an intrusion, and the government seeks to act on less than probable cause, a balancing test must be applied.  The touchstone, of course, is reasonableness.

*Lopez Lopez,* 844 F.2d at 905.  In assessing reasonableness, "judges must weigh the need to search or seize against the invasion the search or seizure entails." *Id.; see also New Jersey v. T.L.O.,* 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985) (plurality opinion);  *Blackburn,* 771 F.2d at 564;  *Manchester,* 711 F.2d at 460–61.  The components of this balancing test

are "[1] the gravity of the public concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the interference with individual liberty."  *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979);  *see also Lopez Lopez,* 844 F.2d at 905 (same;  quoting *Brown* ).

The weighbeam of reasonableness cannot be set in a vacuum.  Virtually by definition, reasonableness is a mutable norm—fact-specific and dependent on the particular circumstances.  In this case, a critically important circumstance is the jailhouse setting:

> Any inquiry into the constitutionality of security measures employed in a penal institution must begin with the premise that "prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."

*Blackburn,* 771 F.2d at 562 (quoting *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979)).  And in *Blackburn,* we noted especially "that the interest of prison officials in intercepting contraband and maintaining internal order must be accorded great weight." *Id.* at 564 (citing, *inter alia, Block v. Rutherford,* 468 U.S. 576, 591, 104 S.Ct. 3227, 3235, 82 L.Ed.2d 438 (1984);  *Hudson v. Palmer* 468 U.S. 517, 526–28, 104 S.Ct. 3194, 3200–01, 82 L.Ed.2d 393 (1984);  *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878).

Thus, in the prison milieu, the cause for public concern runs high.  And in this case, we must add to the official interest in maintaining institutional security what strikes us, at the very least, as a solid basis for particularized suspicion of Brennan's activities.  We then balance against this powerful combination the rather modest extent

---

**2.**  In many cases, it is necessary to differentiate among individual defendants as each may have known, or done, different things.  *See Newman v. Commonwealth of Massachusetts,* 884 F.2d 19, 26 (1st Cir.1989) ("Defendants are liable for

damages only if they *should have known* that *what they did* violated the law.");  *see also Unwin,* 863 F.2d at 133–37 (inquiring separately into qualified immunity of various police officers).  We see no such necessity here.

of the intrusion [3] and the lessened expectation of privacy inuring to one in Brennan's shoes. An expectation of privacy is legitimate where a person has "exhibited an actual (subjective) expectation of privacy and ... the expectation [is] one that society is prepared to recognize as 'reasonable.'" *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967). Given the fact that "society is prepared to recognize as reasonable the proposition that correction officers have diminished expectations of privacy in light of the difficult burdens of maintaining safety, order and security that our society imposes on those who staff our prisons," *SEC. & Law Enforcement Emp., Dist. C. 82 v. Carey*, 737 F.2d 187, 202 (2d Cir.1984), and mindful of the admitted need for heightened security in penal institutions, it would seem that a search and seizure such as that conducted by the officers could hardly have transgressed the fourth amendment. In the real world, prison guards must steel themselves to tolerate even greater incursions. *See id.* at 203–04 (reasonable suspicion justifies strip searches of correctional officers).

Be that as it may, we need not go so far to uphold the district court's grant of summary judgment in favor of the officers. It is crystal clear that, however the merits might be resolved, the officers acted sufficiently within the bounds of reasonableness so as to don the cloak of qualified immunity. It is undisputed that the prison had a problem with contraband; that there was some reason to believe guards might be involved; and that an informant had named plaintiff as a trafficker. It is also undisputed that, before the confrontation blossomed, the officers had given jewelry to an inmate, only to be told, later, that Brennan had accepted the bijouterie and promised to deliver marijuana in exchange. By any stretch of the imagination, this information provided a more than reasonable basis for conducting a search. The officers' conduct was "objective[ly] reasonable[ ] ... as measured by reference to clearly established law." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. Thus, qualified immunity barred plaintiff's damages action against them.[4]

We do not mean to flog a moribund mare. But, it is apparent to us that appellant fails (or refuses) to recognize the essential irrelevancy at this stage of whether he was, or was not, actually guilty of criminal activity. The relevant inquiry, rather, is whether the belief held by the officers was objectively reasonable and sufficed to justify their behavior under the circumstances then extant. *See, e.g., Newman v. Commonwealth of Massachusetts*, 884 F.2d 19, 26 (1st Cir.1989) ("Even if it ultimately can be shown that the decision ... was arbitrary ... defendants are entitled to immunity from damages so long as they had no reason to know that the evidence on which they relied was faulty."). The district court was presented with no evidence tending to show that, given the information available to them, the correctional officers acted unreasonably. Summary judgment was appropriate.

### C. *Reasonableness of Troopers' Actions.*

The two troopers are at yet a further remove. They had no role in devising the sting operation. They remained in their cruiser, outside the prison, until after the episode occurred and Brennan had been grilled by the correctional officers. The troopers were then escorted inside and informed by the ranking officer, Gallant, that (1) the jewelry had been found, (2) Brennan had confessed, and (3) Brennan's employment was being terminated. When the troopers entered the interrogation room, they asked plaintiff to sign a *Miranda*

---

**3.** Brennan was detained, that is, accompanied by officers to an interrogation room at the prison, and questioned. By his account, the "detention" lasted a maximum of 20 minutes. He was told to empty his pockets and suffered minor damage to his shirt and billfold. He was also jostled at one point. He appears to concede, as indeed he must, that negligence alone will not support a section 1983 claim. *See Daniels v.*

*Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986).

**4.** Because plaintiff's complaint seeks only money damages (not reinstatement or other equitable relief), qualified immunity is an absolute defense to the action.

form, questioned him about drug dealings inside and outside the prison, and sent him home with instructions to "return the next day (to the state police barracks) for further questioning." They had no physical contact with plaintiff on that occasion. The record is silent as to the length of the encounter, but the context suggests that it could not have been protracted. The next day, Brennan voluntarily reported to the barracks and was interviewed again. One of the troopers, Hendrigan, thereafter swore out a criminal complaint. At no time was Brennan arrested.

On these facts, it requires no citation of authority to conclude that the troopers' actions were objectively reasonable. Notwithstanding that Brennan says he proclaimed his innocence to the state police[5]—a fact which, for Rule 56 purposes, must be assumed in his favor—it can scarcely be argued that the fourth amendment bars troopers from questioning a prison guard in circumstances like these. After all, "[p]olice officers hear many self-exonerating claims from suspects and should not be required to give significant weight to [those] statements...." *Thompson v. Olson*, 798 F.2d 552, 557 (1st Cir.1986), *cert. denied*, 480 U.S. 908, 107 S.Ct. 1354, 94 L.Ed.2d 524 (1987). The district court commented that it "almost seems ridiculous" that an action was brought against the troopers. We see no "almost" about it. Summary judgment was proper.

### D. *Conspiracy Claim.*

We need not loiter long over plaintiff's ancillary claim that the correctional officers and troopers conspired to deprive him of his constitutional rights. This is not a case where the whole aggregates more than the sum of the parts. As we have noted, *see supra*, there has been no showing whatever that *anyone* deprived Brennan of constitutionally secured rights. That deficit ends the matter. "This court has ruled that for a conspiracy to be actionable under section 1983 the plaintiff has to prove that 'there [has] been, besides the agreement, an actual deprivation of a right secured by the Constitution and laws.'" *Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir.1988) (quoting *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir.1980)); *see also Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir.1977) ("conclusory allegations of conspiracy" cannot support a section 1983 claim), *cert. denied*, 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978). On this record, plaintiff's conspiracy claim is meritless.

### V. THE LIBERTY INTEREST CLAIM

As a probationary employee, Brennan had no property interest in his job. He theorizes, however, that he should have had a pretermination hearing, and that being fired without one deprived him of a liberty interest without due process of law. He says that this deprivation occurred because the charge brought against him threatened "seriously [to] damage his reputation and substantially curtail job opportunities in his chosen profession."

Although the fourteenth amendment offers some measure of protection against governmental action that could "seriously damage [a person's] standing and associations in his community," *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972), the Court has stated specifically that "reputation alone, apart from some more tangible interests such as employment, [is not] either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405 (1976). Rather, reputational injury must coincide with some other "alteration of status." *Id.* at 709–10, 96 S.Ct. at 1164. And, where the claimed alteration involves loss of a job, the Court has insisted that the defamation "occur in the course of the termination of employment." *Id.* at 710, 96 S.Ct. at 1165; *see also Laureano–*

---

**5.** Throughout the criminal proceedings and in the course of this litigation, plaintiff has asserted that he took the jewelry with the intention of turning it in to his supervisor; and that he was besieged by over-eager colleagues before he had an opportunity to obtain and complete a property report form. He claims to have told the same tale all along.

*Agosto v. Garcia–Caraballo*, 731 F.2d 101, 104 (1st Cir.1984) (same). This means, of course, that a public employer's failure to afford a name-clearing hearing for a discharged employee is cognizable under section 1983 as a deprivation of a liberty interest only if (1) the dismissal is grounded on charges which stigmatize the employee, *see Codd v. Velger*, 429 U.S. 624, 627–28, 97 S.Ct. 882, 883–84, 51 L.Ed.2d 92 (1977) (per curiam); *Bishop v. Wood*, 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1975); *Roth*, 408 U.S. at 573, 92 S.Ct. 2707, and (2) "the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination." *Codd*, 429 U.S. at 628, 97 S.Ct. at 884. Moreover, the stigmatization must occur "in the course of the termination of employment." *Paul*, 424 U.S. at 710, 96 S.Ct. at 1165. As we wrote in an earlier case:

> Unless ... defamatory assertions are made before or during the discharge or one has good reason in advance to believe that the discharge of an 'at will' employee will produce such *public* claims, a pre-termination-hearing requirement as a general matter is less necessary. To require it would simply erase in many instances the constitutional distinction between the 'at will' and the 'tenured' employee.

*Laureano–Agosto*, 731 F.2d at 104–05; *see also Ventetuolo v. Burke*, 596 F.2d 476, 482–83 (1st Cir.1979).

■ In order to withstand a motion for summary judgment, then, plaintiff must proffer competent evidence that, *in the course of his dismissal*, defamatory assertions were made. We have scrutinized the record with care and have found no such evidence. The prison officials appear to have been extremely circumspect in what they said at and near the time of Brennan's departure. The record contains not a shred

of competent proof that any stigmatizing statements were uttered.[6]

Plaintiff's allegation that newspaper stories were published "holding [plaintiff] up to public hate, contempt and ridicule, and damaging his reputation" is equally unavailing. The record supplies no evidence that the Sheriff or any of his deputies ever made any announcement concerning Brennan's termination to any news organization. The articles in question, which appeared two months and more after plaintiff's discharge, cannot conceivably be categorized as, or assumed to recount, matters occurring "in the course of the termination." *Laureano–Agosto*, 731 F.2d at 104. Count IV of the complaint comprised suitable grist for the summary judgment mill.

## VI. MISCELLANY

Plaintiff's claim under the state civil rights law, Mass.Gen.L. ch. 12, § 11I, embodied in count III of his complaint, cannot forestall final judgment. Plaintiff has treated the federal and state civil rights claims identically, so we are entitled to assume that they are correlative. *Compare, e.g., Newman*, at 22 n. 3. Therefore, count III fails for the same reasons as count I. Even if this were otherwise, count III, as a pendent state-law claim, would be subject to dismissal under the rule of *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725–27, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966).

Similarly, count V is no obstacle to final disposition. If that count can be read to state an actionable claim at all, it is a state-law claim for infliction of emotional distress. But, pretrial termination of plaintiff's federal-law claims, *see supra,* and the absence of any other cognizable basis for federal jurisdiction, leave a federal court no real choice but to dismiss such a pendent state-law initiative. *See id.*

---

**6.** We can give no weight to plaintiff's self-serving deposition testimony to the effect that a prison guard, not a defendant in this case, told him that two members of the sheriff's department had advised the guards on duty that Brennan was let go because he had been "lugging" drugs into Billerica. Rule 56 requires that an opposition to summary judgment "be made on personal knowledge, ... set[ting] forth facts as would be admissible in evidence...." Fed.R. Civ.P. 56(e). Moreover, even on plaintiff's hearsay account, the alleged communications were made *after* Brennan's discharge and not as part and parcel of the termination proceeding.

## VII. CONCLUSION

We need go no further. Having tasted the record and sampled plaintiff's bill of fare, we are left without sustenance. We agree entirely with the district court that there was no genuine issue as to any material fact, and that all defendants were legally entitled to judgment.

*Affirmed.*