**REED PAPER COMPANY, Plaintiff,**

**v.**

**PROCTER & GAMBLE DISTRIBUTING COMPANY, Defendant.**

**Civ. No. 91–272–P–C.**

United States District Court, D. Maine.

Nov. 4, 1992.

---

Alfred C. Frawley, Brann & Isaacson, Lewiston, ME, for plaintiff, Reed Paper.

John J. O'Leary (lead counsel), Michael Ambler (co-counsel), Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, ME, for defendant, Procter & Gamble.

Phillip D. Buckley, Rudman & Winchell, Bangor, ME, for movants, Robert Lebeau, Robert Allaire, Joseph Gannon.

## MEMORANDUM AND ORDER ON DEFENDANT PROCTER & GAMBLE'S MOTION FOR SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

This is an action for wrongful termination brought by Reed Paper Company ("Reed"), a former distributor of Procter & Gamble Distributing Company's ("P & G") Attends adult incontinence products. The first five counts of the Complaint are based in common law: Count I, misrepresentation; Count II, breach of contract; Count III, promissory estoppel; Count IV, breach of duty of good faith; and Count V, breach of duty to provide reasonable advance notice of termination. Count VI alleges a violation of the Sherman Anti–Trust Act, 15 U.S.C. § 1. The Court now has before it the Defendant's Motion for Summary Judgment (Docket No. 30) on all counts of the Plaintiff's Amended Complaint (Docket No. 2). The Court acts on the motion on the basis of the written submissions of the parties.

A motion for summary judgment must be granted if "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court of Appeals for the First Circuit has aptly articulated the legal standard to be applied in deciding motions for summary judgment:

[T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 [106 S.Ct. 2548, 2554, 91 L.Ed.2d 265] (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904 [96 S.Ct. 1495, 47 L.Ed.2d 754] (1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. *Anderson*, 477 U.S. at 248 [106 S.Ct. at 2510]; *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial' *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d

179, 181 (1st Cir.1989). As the Supreme Court has said:

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or [is not] significantly probative, summary judgment may be granted.

*Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511.

*Brennan v. Hendrigan,* 888 F.2d 189, 191–92 (1st Cir.1989).

The record shows the following undisputed facts. Since the early 1980's, Reed distributed the Attends line of adult incontinence products. Campbell Aff. (Docket No. 44) ¶ 2. Reed was one of several distributors selling Attends to Maine customers. Maine Sysco Incorporated ("Sysco") was a distributor of Attends products in the early 1980's, but ceased distributing the products in 1987. Hughes Dep. at 80–81; Hughes Dep. Ex. 85. Early in 1990, however, Sysco started distributing Attends products again. Lebeau Dep. at 26. Several other Attends distributors operating in Maine were based outside the State. P & G also sold Attends directly to one nursing home in Maine, in competition at the wholesale level with both Reed and Sysco. In Maine, approximately 145 nursing homes are the principal purchasers of adult incontinence products. Mathieu Dep. at 6.

In October 1986, Reed began to distribute a second brand of adult incontinence products, the DriPride/Provide line (Provide) manufactured by Weyeraeuser Corporation. Campbell Dep. II at 130. Subsequently, an agreement arose between P & G and Reed to the effect that Reed would not convert any of its Attends customers to their other brands of incontinence products and P & G would refrain from converting any of Reed's customers to other Attends distributors. Hughes Dep. 247, 273; Smith Dep. I at 42; Smith Dep. Ex. 298; Luciano Dep. at 139–40; Luciano Dep. Ex. 10; Campbell Aff. (Docket No. 44) ¶¶ 15–16. This agreement, also known as "The Golden Rule," was memorialized in a letter dated July 17, 1989, from Thomas Hughes, Eastern District Manager at P & G to John Campbell, President and majority owner of Reed.[1] Hughes Dep. Ex. 104. Thereafter Reed offered both lines of adult incontinence products to its customers.

On May 17, 1991, P & G's Eastern Division Manager, Daniel Baker, decided Reed should not be offered the P & G distributor rebate promotion on Attends briefs scheduled to be introduced in Maine on June 1, 1991. Baker Aff. (Docket No. 36) ¶¶ 9–10. P & G's New England area manager, Debra Luciano, agreed with this decision.[2] Luciano Aff. (Docket No. 34) ¶ 13. Thus, the Maine test market promotion was offered only to Sysco. *Id.* On May 23, 1991, Sysco accepted P & G's offer to participate in the promotion and pass along the P & G rebates to its own customers in the form of lower retail prices on Attends. Baker Aff. (Docket No. 36) ¶ 11.

On May 24, 1991, P & G notified some of Reed's customers, retail purchasers of Attends in Maine, that Sysco would be offering price rebates on the Attends products. Bennett Dep. at 43–46, 56. Reed was notified on May 28, 1991, that Sysco would be distributing Attends with the rebate promotion. Luciano Aff. (Docket No. 34) ¶ 14. On July 16, 1991, Baker made the promotion available to Reed retroactive to its inception date of June 1, 1991. Baker Aff. (Docket No. 36) ¶ 12; Luciano Dep. Ex. 7, 8; Campbell Dep. III 128–29. At that time, Baker also notified Reed that, effective September 30, 1991, P & G was terminating Reed as an Attends distributor. *Id.* Reed

---

1. From December 1985 through June 1990, Hughes was the District Manager for six New England states for the Patient Care Products Division of P & G Distributing Company. During this time Hughes was responsible for several unit managers for the sale of Attends to its distributors for resale to their customers. Hughes Aff. ¶ 4.

2. In June 1990 Luciano succeeded Hughes with the title of New England Area Manager. As Area Manager Luciano reports directly to Baker, Patient Care Products Eastern Division Manager.

never accepted P & G's promotion rebate. Instead, Reed brought an action for wrongful termination on September 6, 1991.[3]

The only written contract in effect at the time of Reed's termination on September 30, 1991 was the "VIP Agreement." That agreement was executed on February 4, 1991, and provided for the promotion of Attends sales by Reed and P & G during the 1991 calendar year. Under the VIP Agreement, P & G agreed to pay Reed for promoting Attends sales. The VIP agreement could be terminated by either party with 30 days notice. Campbell Dep. III at 180–81; Campbell Dep. Ex. 130; Baker Aff. (Docket No. 36) App. D. Previously, the parties had entered into two other types of written contracts. In 1989 and 1990, Reed and P & G entered into annual Attends distributorship contracts which contained a provision permitting either party to cancel the contract by giving 60 days notice. Campbell Dep. I 141; Campbell Dep. Ex. 26A, 27A. The parties did not enter into a written distributorship agreement in 1991. The second type of contract between Reed and P & G was a Government Contract Rebate Agreement. Under the terms of this agreement, Reed agreed to supply qualified facilities with Attends. This contract expired on September 30, 1991. Bennett Aff. (Docket No. 32) App. C; Campbell Dep. Ex. 31C.

## COUNT I MISREPRESENTATION

Reed contends that P & G made a misrepresentation, upon which it justifiably relied, concerning its distributorship relationship with P & G. As a result of this reliance, Reed alleges that it suffered substantial business and property damages. In addition, Reed contends that P & G made actionable misrepresentations to Reed's customers.

### A. Misrepresentation made to Reed

On May 14, 1991, Reed was awarded a new Maine Health Care Shared Services Co-op ("Co-op")[4] contract for Attends to extend through May 1992. Reed contends that P & G encouraged Reed to bid on a one-year contract with the Co-op. Campbell Aff. (Docket No. 44) ¶¶ 8–9. Reed further contends that P & G's encouragement came at a time when it knew it was going to terminate Reed as a distributor. Campbell Aff. (Docket No. 44) ¶¶ 20–21. P & G argues that encouragement alone is not a representation of fact and therefore cannot serve as the basis for an actionable misrepresentation. The essence of Reed's claim is that P & G knowingly omitted to inform Reed of the impending termination and, by so doing, misrepresented its distributorship relationship with P & G.

■■■ Under Maine law, the essential elements of fraudulent misrepresentation are: (1) a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act in reliance upon it, and (5) the plaintiff justifiably relies upon the representation as true and acts upon it to his damage. *Diversified Foods, Inc. v. First National Bank*, 605 A.2d 609, 615 (Me. 1992) (quoting *Butler v. Poulin*, 500 A.2d 257, 260 (Me.1985)). Both omissions and affirmative misrepresentations are actionable under Maine law. *See Horner v.*

---

**3.** In its Amended Complaint Reed states:

> 17. P & G informed Reed, that the Defendant was terminating the relationship as of September 30, 1991. This was the first and only *occasion on which Reed received notice of any intention or decision of Defendant to terminate Reed's distributorship.*
>
> 18. P & G's termination of Reed was without good cause or justification.

Amended Complaint (Docket No. 2) ¶¶ 17–18. However, Reed now contends that it was terminated *to May 1991, apparently when P & G did not offer it the rebate promotion.* Plaintiff's Memorandum in Opposition to Defendant's Mo-

tion for Summary Judgment (Docket No. 46) at 15. Plaintiff has never amended its Complaint to change the date of termination to May. Hence, the Plaintiff has stated no claim based on the earlier date as the date of termination.

**4.** The Maine Health Care Shared Services Co-op is a corporation that assists the members of the Maine Health Care Association ("MHCA") with their purchasing needs. Mathieu Dep. I at 7–8. The Co-op negotiates prices on behalf of Maine nursing homes. *Attends had been sold by Reed through the Co-op for over six years.* Mathieu Dep. I at 45–47.

*Flynn,* 334 A.2d 194, 203 (Me.1975) (overruled on other grounds, *see Taylor v. Commissioner of Mental Health and Mental Retardation,* 481 A.2d 139 (Me.1984)).

■ After careful consideration of the record before it, the Court concludes that there is a genuine issue of material fact as to whether P & G knew, at the time that it made these representations about the future of Reed's distributorship, that it was going to terminate Reed. Thus, summary judgment for P & G is not appropriate for the portion of Count I alleging a misrepresentation to Reed.

### B. Misrepresentations to Reed's customers

1. Caring Practices Agreements

Reed raises two types of misrepresentations made to its customers. First, Reed contends that P & G falsely caused Reed's customers, and Reed, to believe Reed would continue to serve as the customers' distributor by entering into a marketing agreement with some of Reed's customers called the "Caring Practices Agreement." Bennett Dep. at 119, Bennett Dep. Ex. 283; Luciano Dep. I at 153; Campbell Aff. (Dockt No. 44) ¶ 20. Reed received a copy of the signed Caring Practices Agreements from P & G. Bennett Dep. at 103. Each agreement was designed to last a full calendar year, during which time the nursing home was committed to buying from Reed, P & G's named distributor in the agreement. Bennett Dep. at 119; Luciano Dep. I at 153. P & G, Reed alleges, entered into these agreements knowing Reed was to be terminated as a distributor.

■ A cause of action for misrepresentation to third parties exists only for a misrepresentation made by Defendant to such third parties if the Defendant intended, or had reason to expect, that on repetition, the statements would influence Plaintiff's conduct to Plaintiff's detriment. Restatement (Second) of Torts § 533 and comment d (1977); *Peerless Mills, Inc. v. American Tel. & Tel. Co.,* 527 F.2d 445, 450 n. 2 (2d Cir.1975) (holding liability requires defendant to have intended his representation to reach and influence the

plaintiff). Thus, Reed only has a cause of action for misrepresentation based on the Caring Practices Agreements if P & G entered into the Agreements with the intention or expectation that, Reed's knowledge of the Agreements, would cause Reed to act to its detriment. A P & G Sales Representative explained why Reed's name is on the Caring Practices Agreements as follows: "The point is that this brings our distributors into the loop. The distributors know that this facility will be buying from them.... [The Caring Practices Agreement] simply makes distributors feel good, feel more secure." Bennett Dep. at 103, Bennett Dep. Ex. 283. It appears, from this statement, that P & G intended the Caring Practices Agreements to make Reed feel more secure, and thereby influence Reed to continue to invest effort and money toward the development of Attends business. Again, the unresolved factual issue is whether P & G knew it was going to terminate Reed's distributorship when it entered into the Caring Practices Agreements with Reed customers. Because P & G's knowledge at the time is a genuine issue of material fact, summary judgment is not appropriate on the portion of Count I alleging misrepresentation based on the Caring Practices Agreements.

### 2. P & G's Statements to Reed's Customers

Reed also alleges that, although P & G never offered it the test market rebate promotion, P & G misrepresented to some of Reed's customers that Reed refused to participate in the rebate promotion offered by P & G and that P & G encouraged Reed's customers to do business with Sysco. Campbell Aff. (Docket No. 44) ¶ 22. Reed relies solely on Campbell's affidavit to support its assertion. Campbell Aff. (Docket No. 44) ¶ 19. John Bennett, Sales Representative for P & G, and Luciano agree that they contacted Reed customers to inform them that a rebate would be available from Sysco, but both deny that they ever told Reed's customers that Reed declined to participate in the promotion. Bennett Dep. at 43–46, 56; Luciano Aff.

(Docket No. 34) ¶ 19; Luciano Dep. II at 80–82.

■ Under Fed.R.Civ.P. 56, this Court can give no weight to Campbell's affidavit testimony that P & G told some Reed customers that Reed had been offered, yet declined, the test market rebate promotion. Rule 56 requires that an opposing affidavit must "be made on personal knowledge, ... set forth facts as would be admissible in evidence, and ... show affirmatively that the affiant is competent to testify as to the matters stated therein." Fed.R.Civ.P. 56(e). Campbell is not basing his statement on personal knowledge. Rather, he is testifying to what his customers told him P & G representatives said to them. Campbell's affidavit testimony that P & G told some Reed customers that Reed had been offered and declined the test market rebate promotion amounts to inadmissible hearsay. Hearsay evidence which would be inadmissible at trial, cannot be considered on a motion for summary judgment. *See Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990); *Brennan v. Hendrigan,* 888 F.2d 189, 196 n. 6 (1st Cir.1989); *Morrissey v. Procter & Gamble Co.,* 379 F.2d 675, 677 n. 2 (1st Cir.1967). Thus, absent a showing of admissibility, and none is presented here, Plaintiff may not rely on hearsay to oppose a motion for summary judgment. Accordingly, summary judgment is granted with respect to the portion of Count I alleging misrepresentations were made by P & G when its representatives contacted Reed's customers.

## COUNT II BREACH OF CONTRACT

Nowhere in its Complaint or Response to Defendants Motion for Summary Judgment does Reed attempt to explain which agreement(s) or promise(s) it relies on as a basis for its contract claim(s). The Court, therefore, examines the universe of possible contract claims on the facts presented by Reed.

### A. Written Distributor Contracts

■ Two written contracts existed between P & G and Reed in 1991. The first was a Government Contract Rebate Agreement, which expired by its terms on September 30, 1991—the date of Reed's termination. This contract was not breached by Reed's termination. The second was an Attends VIP Agreement, which provided for promotional payments to Reed for various sales activities. The VIP Agreement provided an express term permitting either party to terminate on 30 days written notice. The VIP Agreement did not restrict the termination right to terminations "for cause", or in any other way. P & G terminated the VIP agreement with 75 days written notice. Accordingly, there is no genuine issue of material fact as to the breach of any written contract. This Court holds that, as a matter of law, there was no breach of any written distributor contracts.

### B. Oral Distributor Contracts

In its Amended Complaint, Reed alleges breach of an "Agreement between Defendant and Reed ... both as executed and as subsequently amended by the written and oral promises, assurances, and representations of Defendant." Amended Complaint (Docket No. 2) ¶ 27. When asked by Defendant to identify the nature of the oral contract existing between the parties, Reed responded that "Reed does not maintain that formal distributorship agreements were oral in nature." Defendant's First Set of Interrogatories (Docket No. 37) # 4. Careful scrutiny of the record does not reveal any oral agreements controlling the terms of the distributorship. Thus, there is no genuine issue of material fact and this Court holds, as a matter of law, that there was no breach of any oral distributor contract.

### C. Distributor Course of Dealing

■ P & G and Reed entered into written distributor contracts in 1989 and 1990. The parties had no such written contract for the calendar year 1991. Nevertheless, an agreement could be implied from the parties' course of dealing. *See* Restatement (Second) of Contracts § 223 (1981). With respect to mutual termination rights, a course of dealing was established by the 1989 and 1990 written distributor

contracts. Those contracts expressly permitted termination by either party, without cause, with sixty days written notice. Luciano Aff.App. (Docket No. 34) I, J. Reed has presented no evidence of any course of dealing requiring otherwise. Where cause for termination had never been required by the written contracts governing the parties' relationship, this Court will not require one after the contracts' expiration. Moreover, a distributorship contract without a specified duration is terminable without cause, upon reasonable notice. *See* 67 Am.Jur.2d *Sales* § 370 (1985). Furthermore, P & G complied with the 60 day advance notice as provided for by the previous distributor contracts. *See George R. Darche Associates, Inc. v. Beatrice Foods Co.*, 538 F.Supp. 429, 435 (D.N.J.1981) (60–day termination notice reasonable when given in accordance with most recent, expired, written distributor agreement and defendant manufacturer therefore entitled to summary judgment on plaintiff's claim for breach of covenant of good faith and fair dealing). Therefore, there is no genuine issue of material fact as to breach of any contractual arrangement arising out of the course of dealing between Reed and P & G, and as a matter of law, there is no breach of contract claim based on a course of dealing.

### D. Other Contracts

Reed's breach of contract claim could be based on an agreement memorialized in a letter from Baker to Campbell on July 17, 1989, referred to as "The Golden Rule." As previously discussed, the essence of the rule is that handling a competitive product was agreeable to P & G provided that Reed did not try to convert Attends customers to the competitive product. In return, P & G agreed not to convert any of Reed's customers to other distributors. This agreement constitutes a bilateral contract. *See Shaw v. Philbrick*, 129 Me. 259, 261–62, 151 A. 423, 425 (1930).

Whether P & G breached the contract in the process of contacting Reed's customers and informing them of the rebate on attends available from Sysco is unclear. The evidence shows that P & G contacted Reed customers as early as May 24, 1991. Bennett Dep. at 43–46, 56. However, exactly what P & G said to Reed's customers is in dispute. What P & G said to Reed's customers and whether the communication with Reed's customers was sufficient to constitute a conversion, thus, breaching the bilateral contract, cannot be determined as a matter of law. Because of this genuine issue of material fact, summary judgment is denied on Count II.

### COUNT III PROMISSORY ESTOPPEL

Reed contends that the promises, assurances, and representations made by P & G constitute a claim for promissory estoppel. Specifically, Reed alleges that P & G promised that their relationship "would operate on a good faith basis and continue from year to year unless terminated for good cause." Amended Complaint (Docket No. 2) ¶ 29. All P & G representatives who dealt with Reed or its representatives deny making any such agreement with Reed. Hughes Aff. (Docket No. 33) ¶ 14; Bennett Aff. (Docket No. 32) ¶ 25; Baker Aff. (Docket No. 36) ¶ 21; Luciano Aff. (Docket No. 34) ¶ 22. Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Reed fails to point to one place in the record where Reed or one of its representatives, was promised that their relationship with P & G "would operate on a good faith basis and continue from year to year unless terminated for cause." Because Reed has failed to support its claim with any evidence beyond the pleadings, summary judgment is granted on Count III.

### COUNT IV BREACH OF DUTY OF GOOD FAITH

P & G seeks summary judgment on Reed's claim that the termination of the parties' business relationship constituted a breach of the covenant of good faith. The Maine Uniform Commercial Code implies a duty of good faith in every contract within

its scope. *See* 11 M.R.S.A. §§ 1–203, 1–201(19), 2–103(1)(b). Similarly, the common law implies a general duty of good faith in contracts. *See* Restatement (Second) of Contracts § 205 (1981).

Reed's Amended Complaint states that its *termination* was the basis for P & G's breach of duty of good faith.[5] This Court has found that no distributorship contract was breached by the termination; thus, no breach of duty of good faith has occurred in connection with Reed's September termination.[6] Accordingly, Count IV must be dismissed.

## COUNT V BREACH OF DUTY OF PROVIDING REASONABLE NOTICE OF TERMINATION

In Count V, Reed contends that P & G breached the duty to provide reasonable advance notice of Reed's termination. P & G sent Reed a letter on July 16, 1991, stating that it would be discontinuing Reed's distributorship on September 30, 1991.[7] The only written contract which needed to be terminated in 1991 was the VIP Agreement, which allowed termination by either party on 30 days notice. The Court finds that P & G's 75 day written notice of termination was reasonable as a matter of law. *See Beatrice Foods*, 538 F.Supp. at 435 (60–day termination notice reasonable when given in accordance with most recent, expired, written distributor agreement and defendant manufacturer therefore entitled to summary judgment). *See also Joe Regueira, Inc. v. American Distilling Co.*, 642 F.2d 826, 831 (5th Cir. 1981) (summary judgment on breach of contract claim granted where distributor gave thirty days notice); *Dart Industries, Inc. v. Plunkett Co. of Oklahoma, Inc.*, 704 F.2d 496, 500 (10th Cir.1983) (summary judgment granted on distributor's breach of contract claim where manufacturer gave three months' notice prior to termination of distributorship). Accordingly, Count V must be dismissed.

## COUNT VI ANTITRUST

In Count VI, Reed sets forth a claim based on P & G's alleged violation of the Sherman Act, 15 U.S.C. § 1.[8] The Amended Complaint alleges that concerted action between P & G and Sysco to terminate Reed constitutes an unlawful restraint on trade.[9] Reed does not allege in Count VI

---

**5.** Count IV of Reed's Amended Complaint states in pertinent part:

P & G breached a duty of good faith to the detriment of Reed in connection with its termination of Reed's Agreement and the notice, and lack thereof, of such termination. As a result of the aforesaid actions, Reed has been damaged by its loss of the right to sell P & G products and the destruction of its business. Amended Complaint (Docket No. 2) ¶ 33.

**6.** A breach of the duty of good faith regarding Reed's *termination* could not possibly be implied in the parties' oral agreement not to convert—previously referred to as "The Golden Rule." If any breach of this agreement took place, it was in May when P & G contacted Reed customers. As pled, this oral agreement, and its alleged breach, have nothing to do with the September termination, or the requirements for termination. Reed did not lose its right to sell Attends products in May, as a result of P & G's alleged breach of the rule. Reed continued to able to distribute Attends products for approximately four months after P & G contacted its customers.

**7.** Reed responds to the Motion for Summary Judgment by claiming that the termination took place in May 1991, and there was insufficient notice at that time. Because the Court finds that termination took place in September, it is unnecessary to address the issue as to whether there was sufficient notice in May.

**8.** Section 1 provides in relevant part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

**9.** The antitrust portion of Plaintiff's Amended Complaint provides:

39. Upon information and belief, P & G in concert with Maine Sysco, Inc., replaced Reed with Maine Sysco as a distributor of Attends products. Upon information and belief, Maine Sysco is the sole Maine distributor of Attends products.

40. The Agreement between P & G and Maine Sysco to replace Reed with Maine Sysco, with Maine Sysco the sole Maine distributor of Attends products, was intended and designed to affect P & G's competitors for adult incontinency products. If effected, the termination of Reed will, in fact, stifle competition in the sale of adult incontinency products in the State of Maine.

or disclose elsewhere in the Amended Complaint any facts which implicate any theory of antitrust liability other than the "rule of reason."[10] Reed never pleaded the antitrust claim of *per se* price-fixing it now seeks to pursue.[11] In its Response to Defendant's Motion for Summary Judgment, Reed contends that P & G agreed, at least twice, with Sysco on the desired level of resale prices. Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Docket No. 46) at 13. Contrary to Reed's assertion, there is no factual predicate in the Amended Complaint for an antitrust cause of action based on price-fixing.

Rule 8(a) requires that the complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). Under the Federal Rules of Civil Procedure, the plaintiff need only state a set of facts giving rise to a claim, and not the legal theory behind the claim, sufficient to place defendant on notice as to the type of claim alleged and the grounds upon which it rests. *See Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Fitzgerald v. Codex Corp.*, 882 F.2d 586,

41. In addition, P & G's efforts, in combination with Maine Sysco to eliminate Reed Paper Co. as a distributor of Attends products, lessened competition among Attends distributors, as well as among sellers of adult incontinency products generally.
42. The actions of P & G, as alleged herein, constitute an unlawful restraint of trade in violation of 15 U.S.C. § 1.
Amended Complaint (Docket No. 2) ¶¶ 39–42.

10. Literally applied, 15 U.S.C. § 1 would outlaw every conceivable contract or combination thereof which could be made concerning trade or commerce or the subjects of such commerce. *See Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Consequently, the Supreme Court has read a "rule of reason" into the Sherman Act. *Id.* Under the rule of reason the term "restraint of trade" means what it meant at common law: only those acts, contracts, agreements, or combinations which prejudice public interest by unduly restricting competition or unduly obstructing the due course of trade or which injuriously restrain trade either because of their inherent nature or effect or because of their evident purpose, are actionable. *United States v. American Tobacco Co.,* 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911). Generally, concerted action under section 1 is analyzed

589 (1st Cir.1989); *Columbus, Cuneo, Cabrini Medical Center v. Travelers Ins. Co.,* 725 F.Supp. 396, 397 (N.D.Ill.1989); *Geringer v. Wildhorn Ranch, Inc.,* 706 F.Supp. 1442, 1447 (D.Colo.1988); *Barlow v. Pep Boys, Inc.,* 625 F.Supp. 130, 132 (E.D.Pa.1985). "While a detailed listing of the facts is not required, general legal conclusions will seldom satisfy the pleader's duty to state the grounds upon which the claim rests." *Romero v. Otero,* 678 F.Supp. 1535, 1537 (D.N.M.1987). Moreover, a general allegation that defendant violated one of the antitrust laws and that plaintiff was injured thereby is not sufficient. Enough information should be pleaded such that the elements of the claim for relief can be identified. *See Mountain View Pharmacy v. Abbott Laboratories,* 630 F.2d 1383, 1388 (10th Cir.1980) (complaint filed by retail druggists against drug manufacturers alleging antitrust violations, which did little more than recite relevant antitrust laws and which did not allege any specific act by any defendant concerning any drug upon which injury to any plaintiff was predicated, was dismissed).

Reed attempts to convert the pleaded claim into a price-fixing claim by stating:

under the "rule of reason." *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). While 15 U.S.C. § 1 prohibits only unreasonable restraints of trade, certain restraints of trade are unreasonable *per se. Per se* violations are agreements or practices "which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern P.R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Vertical and horizontal agreements on resale prices fall into the *per se* unreasonable category. *See Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988); *United States v. Container Corp. of America,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969).

11. As far as the Court can see, the allegation of price-fixing first appeared in this case *after* the deadline for amended pleadings, in an answer to an interrogatory approximately two months before the close of discovery. Plaintiff's Response to Defendant's First Set of Interrogatories (Docket No. 37) # 18.

"The elimination of Reed was a cornerstone of the pricing program which P & G and Maine Sysco agreed to ... set Sysco's resale prices." Plaintiff's Memorandum in Opposition to Defendants Motion for Summary Judgment (Docket No. 46) at 12. At first glance, this statement seems to tie the plan to eliminate Reed to the alleged price-fixing agreements between P & G and Sysco. However, the facts alleging price-fixing are simply not disclosed in the Amended Complaint. Concerted action to terminate a distributor and price-fixing may, on some set of facts, constitute the same cause of action. In this case, however, the facts necessary to accomplish this are missing from the Amended Complaint.

 Although summary judgment on an antitrust claim is the exception rather than the rule, see *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), the Court believes it is proper in this case. The Court is aware of the current trend toward greater liberality in pleading antitrust claims. *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure:* Civil 2d § 1228, at 222 (1990). Nonetheless, the requirements for pleadings set forth in Rule 8(a) apply to all actions in the federal courts. Thus, a plaintiff must state the facts upon which its claim for relief rests. In reaching this conclusion, the Court is not demanding an inordinate level of factual specificity in the pleadings. Rather, the Court simply recognizes that factual pleading is required only insofar as it is necessary to place the defendant on notice as to the type of claim alleged and the grounds upon which it rests. In the instant case, Reed's Amended Complaint did not alert P & G to the fact that it intended to pursue a price-fixing antitrust claim. Moreover, Reed has never attempted to amend its complaint to add facts that would support a price-fixing violation.

The Court will now examine the antitrust claim which does have a factual predicate in the Amended Complaint—concerted action between P & G and Sysco to terminate Reed with resulting harm to competition. The Court finds that Reed has abandoned this claim by failing to respond to Defendant's Motion for Summary Judgment on this issue. Reed has waived its arguments on the only antitrust claim pled. *See Collins v. Marina–Martinez,* 894 F.2d 474, 481 n. 9 (1st Cir.1990); *Miller Hydro Group v. Popovitch,* 793 F.Supp. 24, 27 n. 2 (D.Me.1992). Consequently, Reed has failed to show that a material fact issue exists with regard to its antitrust claim. Thus, summary judgment is granted on Count VI.

Accordingly, it is *ORDERED* that Proctor & Gamble's motion for summary judgment be, and is hereby, *GRANTED* on Counts III and VI, and that portion of Count I alleging misrepresentation based on statements made by P & G representatives to Reed's customers. It is further ORDERED that Counts IV and V are dismissed.

SO ORDERED.