<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 UNITED STATES COURT OF APPEALS
                     FOR THE FIRST CIRCUIT
                   _________________________

No. 97-2260

                     GRANCID CAMILO-ROBLES,
                      Plaintiff, Appellee,

                               v.

     DR. GUILLERMO HOYOS AND DR. HECTOR O. RIVERA-GONZALEZ,
                    Defendants, Appellants.
                   _________________________

No. 97-2261

                     GRANCID CAMILO-ROBLES,
                      Plaintiff, Appellee,

                               v.

                    PEDRO A. TOLEDO-DAVILA,
                     Defendant, Appellant.
                   _________________________

No. 97-2262

                     GRANCID CAMILO-ROBLES,
                      Plaintiff, Appellee,

                               v.

                      GILBERTO DIAZ-PAGAN,
                     Defendant, Appellant.
                   _________________________

No. 97-2264

                     GRANCID CAMILO-ROBLES,
                      Plaintiff, Appellee,

                               v.

                    PABLO SANTIAGO-GONZALEZ,
                     Defendant, Appellant.

                   _________________________

         APPEALS FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

       [Hon. Carmen Consuelo Cerezo, U.S. District Judge]

                   _________________________

                             Before

                     Selya, Circuit Judge,

                Campbell, Senior Circuit Judge,

                   and Stahl, Circuit Judge.

                   _________________________

    Roberto Lefranc Romero, with whom Martinez Alvarez, Menendez
Cortada & Lefranc Romero was on brief, for appellants Hoyos and
Rivera-Gonzalez.
    John F. Nevares, with whom Ayleen Charles, Lizzie Portela, and
Smith & Nevares were on brief, for appellant Toledo-Davila.
    Orlando Duran-Medero, with whom Ricardo R. Rodriguez Padilla
Law Offices was on brief, for appellant Diaz-Pagan.
    Roberto Santana Aparicio, with whom Marisol Vega Coputo and
Del Toro & Santana were on brief, for appellant Santiago-Gonzalez.
    Judith Berkan, with whom Peter Berkowitz was on brief, for
appellee.

                   _________________________

                        June 29, 1998

                   _________________________

         SELYA, Circuit Judge.  After suffering indignities at the
hands of an unstable police officer, plaintiff-appellee Grancid
Camilo-Robles sued an array of defendants under 42 U.S.C.  1983
(1994). In due season, five such defendants, appellants here,
moved for summary judgment on the ground of qualified immunity.  
The district court rejected their motions (in some instances
without waiting for an opposition).  Although the timing of the
district court's ruling and the lack of any authoritative insight
into the court's reasoning complicate our task, we affirm.
I.  BACKGROUND
    Parking privileges denote special status in our motorized
society, and emotions often run high when a parking space is at
stake.  This case vividly illustrates that verity.
    On May 13, 1994, Miguel Diaz-Martinez, a police officer
assigned to the Bayamon Criminal Investigation Corps (CIC), sought
to park in an area reserved for judges at the Bayamon Judicial
Center.  Camilo-Robles, a security guard sworn to protect that
hallowed ground, told Diaz-Martinez that he could not park there.  
In response to this perceived affront, Diaz-Martinez placed his
hand on his gun, arrested Camilo-Robles, handcuffed him, shoved the
prisoner into his (Diaz-Martinez's) police cruiser, and drove to
the station house (pausing to punch Camilo-Robles in the stomach
and slap him in the face).  Upon their arrival, Diaz-Martinez
forced the plaintiff to remove his belt and shoes and placed him in
a cell with other detainees.  Cooler heads prevailed, and Diaz-
Martinez's prey was released, uncharged, some three hours later.
    Camilo-Robles sued Gilberto Diaz-Pagan (director of the
Bayamon CIC), Pablo Santiago-Gonzalez (Bayamon area commander), and
Pedro A. Toledo-Davila (superintendent of police).  In addition to
these high-ranking police officials, Camilo-Robles named a host of
other defendants including inter alia two psychiatrists who worked
for the police department, Drs. Guillermo Hoyos and Hector O.
Rivera-Gonzalez.  Invoking section 1983, Camilo-Robles alleged that
these five named defendants (collectively, "the appellants") had
deprived him of his civil rights by their deliberate indifference
in carrying out their supervisory responsibilities (with the result
that Diaz-Martinez, a demonstrably unstable officer, was allowed to
remain on active duty).
    The district court issued its scheduling order on
February 21, 1996.  In December of that year, the appellants filed
summary judgment motions.  Camilo-Robles responded on the merits to
the psychiatrists' summary judgment motion, but served a cross-
motion seeking additional time in which to oppose the police
officials' motions, see Fed. R. Civ. P. 56(f), explaining that they
had stonewalled during pretrial discovery.  The district court
granted this cross-motion without limit of time and referred all
pending discovery matters to a magistrate judge.  Lassitude set in,
and the magistrate made no rulings until August 26, 1997.  Two days
later, the district court denied the appellants' summary judgment
motions in a curt, two-page order.  These appeals followed.  
II.  A CAREER TO MAKE ST. SEBASTIAN WEEP
      Because the allegations of liability and the defenses
thereto hinge upon what actions the various defendants took (or
should have taken) in light of Diaz-Martinez's flagitious history
of violence, the latter's career is of great relevance.  We extract
the facts from the summary judgment record, resolving all conflicts
in favor of the plaintiff.  See Garside v. Osco Drug, Inc., 895
F.2d 46, 50 (1st Cir. 1990).
    Diaz-Martinez joined the police force as a cadet in March
1984.  That December, he was suspended for an assault.  Despite the
suspension, he became a regular officer and served as such for the
next five years.  His record reflects numerous disciplinary
infractions involving violent and/or threatening behavior   we
count at least eighteen   many of which entailed unwarranted
brandishing of his weapon.  The denouement occurred in August 1989
when, after assaulting his wife, Diaz-Martinez entered the Catano
police station, seized a shotgun, and held several gendarmes
(including the acting police superintendent) hostage for several
hours.
    Subsequent to this bizarre display, Diaz-Martinez was
committed involuntarily to a psychiatric hospital and diagnosed as
schizophrenic.  The hospital discharged him and three months later
a police psychiatrist, Dr. Pagan-Davis, recommended that he be
separated from the force and given a civilian position.  The police
department suspended Diaz-Martinez in 1990 and formally expelled
him in 1991.
    Justice sometimes moves in mysterious ways.  Diaz-
Martinez successfully appealed his expulsion and the police
department reinstated him in May 1993.  While on desk duty, he
assaulted a civilian.  Nevertheless, Drs. Hoyos and Rivera-Gonzalez
found Diaz-Martinez free from mental illness and fit for active
duty (with no restrictions) when they examined him in August.  The
department promptly rearmed him and assigned him to work in a high-
tension neighborhood.  On September 8, 1993 (the day following his
return to active duty), Diaz-Martinez engaged in an altercation
with two unarmed, law-abiding neighborhood residents.  In the
course of this fracas, he shot both of them, wounding one and
killing the other.  See Diaz v. Diaz Martinez, 112 F.3d 1, 2 (1st
Cir. 1997) (summarizing the facts of that episode).  The police
department immediately confiscated his weapon.
    After a self-imposed exile, Diaz-Martinez returned to
desk duty in November 1993.  On January 20, 1994, while still
unarmed, Diaz-Martinez threatened to kill a fellow officer at the
Bayamon Radio Center.  Six days later, he was transferred to the
Bayamon CIC.  On February 28, 1994, Drs. Hoyos and Rivera-Gonzalez
again examined Diaz-Martinez and again declared him ready for
unrestricted active duty and fit to carry a weapon.  The police
department rearmed him forthwith.
    The incident that sparked this suit occurred in May of
1994.  The police department again expelled Diaz-Martinez that
August.  He eventually pled guilty to voluntary manslaughter in
connection with the September 1993 shootings and was sentenced to
serve a prison term.
III.  THE LEGAL LANDSCAPE
    Before tackling the vagaries of each defendant's appeal,
we first must map the crossroads at which the qualified immunity
doctrine and principles of supervisory liability under section 1983
intersect.  We then discuss pertinent questions of appellate
jurisdiction and pause to note the somewhat tentative nature of
orders denying summary judgment in the qualified immunity context.
       A.  Qualified Immunity and Supervisory Liability.
    Federal law provides a cause of action when an
individual, acting under color of state law, deprives a person of
federally assured rights.   See 42 U.S.C.  1983.  Public officials
who stand accused of civil rights violations under section 1983
nonetheless can avoid liability for money damages by showing either
that they did not violate a right clearly established under federal
law or that they acted with objective legal reasonableness.  SeeHarlow v. Fitzgerald, 457 U.S. 800, 819 (1982); Buenrostro v.
Collazo, 973 F.2d 39, 42 (1st Cir. 1992).
    The Supreme Court has emphasized that a section 1983
plaintiff must allege a violation of a clearly established right
secured either by the Constitution or by some other federal law.  
See County of Sacramento v. Lewis, ___ S. Ct. ___, ___ n.5 (1998)
[1998 WL 259980 at *4 n.5].  Here, the plaintiff vaults this hurdle
with room to spare.  The right to be free from unreasonable seizure
(and, by extension, unjustified arrest and detention) is clearly
established in the jurisprudence of the Fourteenth Amendment
(through which the Fourth Amendment constrains state action).  The
right to due process of law (and, by extension, to be free from
police brutality) is likewise clearly established under the
Fourteenth Amendment (through which the Fifth Amendment constrains
state action).
    We have not had occasion to address the question whether,
to be liable under section 1983, a supervisor must have violated an
independent, "clearly established" right, or whether a supervisor
may be liable based only on his proximity to a subordinate's
violation of a "clearly established" right.  Other circuits,
however, have addressed this interplay between the "clearly
established" requirement and supervisory liability.  We follow
their lead and adopt an approach that comports with the core
principle of qualified immunity by protecting supervisory officials
from suit when they could not reasonably anticipate liability.
    When a supervisor seeks qualified immunity in a section
1983 action, the "clearly established" prong of the qualified
immunity inquiry is satisfied when (1) the subordinate's actions
violated a clearly established constitutional right, and (2) it was
clearly established that a supervisor would be liable for
constitutional violations perpetrated by his subordinates in that
context.  See Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 456
(5th Cir. 1994); Shaw v. Stroud, 13 F.3d 791, 801 (4th Cir. 1994).  
In other words, for a supervisor to be liable there must be a
bifurcated "clearly established" inquiry   one branch probing the
underlying violation, and the other probing the supervisor's
potential liability.
    Here, both elements are satisfied.  We already have noted
that the plaintiff's clearly established rights were violated, seesupra Part III(A), and it is equally well settled that a
deliberately indifferent police supervisor may be held liable for
the constitutional violations of his subordinates.  See Diaz, 112
F.3d at 4.
    The question, then, reduces to the test of objective
legal reasonableness.  This test does not serve as a proxy for
liability, because even state actors who commit constitutional
violations may be entitled to qualified immunity.  See, e.g.,
Ringuette v. City of Fall River, ___ F.3d ___, ___ (1st Cir. 1998)
[No. 96-1107, slip op. at 10]; Brennan v. Hendrigan, 888 F.2d 189,
194 (1st Cir. 1989).  Instead, the test's utility is restricted to
the qualified immunity inquiry.  In that milieu, the test provides
a method for determining whether, in relation to a clearly
established right, a defendant's conduct was (or was not)
reasonable.  Withal, objective legal reasonableness is a concept
that grew up in the prototypical section 1983 context   a context
in which a state actor ("A") inflicts injury directly on a victim
("V") in derogation of V's constitutionally-protected rights.  
Where the context shifts   as where A is not a direct actor (i.e.,
he himself did not perpetrate the seizure, detention, or assault of
which V complains), but, rather, stands accused of permitting a
third person ("B"), also a state actor, to violate V's rights   the
test remains intact, but its focus shifts.  In this tri-cornered
situation, objective legal reasonableness (and, hence, qualified
immunity) necessarily depends upon the relationship between A's
acts or omissions and B's conduct.
    This brings us to the doctrine of supervisory liability,
which holds that a supervisor (defined loosely to encompass a wide
range of officials who are themselves removed from the perpetration
of the rights-violating behavior) may be liable under section 1983
if he formulates a policy or engages in a practice that leads to a
civil rights violation committed by another.  See City of Oklahoma
City v. Tuttle, 471 U.S. 808, 823-24 (1985).  Notice is a salient
consideration in determining the existence of supervisory
liability.  See Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87,
93 (1st Cir. 1994) (treating as "[a]n important factor . . .
whether [the supervisor] was put on notice of behavior which was
likely to result in the violation of . . . constitutional rights").  
Nonetheless, supervisory liability does not require a showing that
the supervisor had actual knowledge of the offending behavior; he
"may be liable for the foreseeable consequences of such conduct if
he would have known of it but for his deliberate indifference or
willful blindness."  Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d
576, 582 (1st Cir. 1994).
    To demonstrate deliberate indifference a plaintiff must
show (1) a grave risk of harm, (2) the defendant's actual or
constructive knowledge of that risk, and (3) his failure to take
easily available measures to address the risk.  See Manarite v.
City of Springfield, 957 F.2d 953, 956 (1st Cir. 1992).  This
formulation correctly implies that deliberate indifference alone
does not equate with supervisory liability; a suitor also must show
causation.  See Maldonado-Denis, 23 F.3d at 582 (explaining that
the supervisor must have "had the power and authority to alleviate
[the violation]").  In other words, the plaintiff must
"affirmatively connect the supervisor's conduct to the
subordinate's violative act or omission."  Id.  This affirmative
connection need not take the form of knowing sanction, but may
include tacit approval of, acquiescence in, or purposeful disregard
of, rights-violating conduct.  See id.  
    This returns us to the point of our beginning:  the
relationship between qualified immunity and supervisory liability.  
By definition, a defendant who claims qualified immunity must do so
either on the theory that the asserted right is not clearly
established or on the theory that the conduct attributed to him
satisfies the test of objective legal reasonableness.  See Harlow,
457 U.S. at 819.  Because the constitutional rights and supervisory
liability doctrine that underlie Camilo-Robles's claim are clearly
established, the qualified immunity analysis here turns on whether,
in the particular circumstances confronted by each appellant, that
appellant should reasonably have understood that his conduct
jeopardized these rights.  See Ringuette, ___ F.3d at ___ [slip op.
at 10]; Berthiaume v. Caron, ___ F.3d ___, ___ (1st Cir. 1998) [No.
97-1958, slip op. at 7].
    The inquiry into qualified immunity is separate and
distinct from the inquiry into the merits.  Consequently, courts
are well-advised to separate "qualified immunity" analysis from
"merits" analysis whenever practicable.  In some circumstances,
however, these inquiries overlap.  So it is here:  the appellants
stand accused of culpable conduct in a setting that requires an
inquiry into deliberate indifference (which is customarily a
merits-related topic).
    Given this setting, discerning whether a particular
appellant's behavior passes the context-specific test of objective
legal reasonableness to some extent collapses the separate
"qualified immunity" and "merits" inquiries into a single analytic
unit.  Such an approach is unusual, but we occasionally have
engaged in precisely this sort of merits-centric analysis in the
course of deciding questions of qualified immunity.  See, e.g.,
Morales v. Ramirez, 906 F.2d 784, 787 (1st Cir. 1990) (explaining
"that, in certain cases, some aspect of the merits may be
inexorably intertwined with the issue of qualified immunity")
(citation and internal quotation marks omitted); Amsden v. Moran,
904 F.2d 748, 753-58 (1st Cir. 1990) (examining the substance of
the plaintiff's due process claims to determine the defendants'
eligibility for qualified immunity).
    We weave these strands together into a thread that binds
these appeals.  The plaintiff alleges a violation of clearly
established constitutional rights and asserts that several
defendants bear supervisory liability for that violation.  
Responding to these allegations, each defendant claims qualified
immunity and, because both the rights in question and each
defendant's susceptibility to supervisory liability are clearly
established, these qualified immunity claims hinge on whether that
defendant's conduct was objectively reasonable.  Since our inquiry
into objective legal reasonableness involves deliberate
indifference, however, we are compelled to engage the merits to a
greater extent than is usual.
      B.  Considerations Affecting Appellate Jurisdiction.
    Were we reviewing a district court's grant of summary
judgment based on qualified immunity, our course would be clear:  
we would determine de novo whether the affected defendant was
entitled to a favorable judgment as a matter of law.  Here,
however, the summary judgment motions were denied, not granted, and
this fact complicates our analysis.  In the qualified immunity
realm, the dividing line between appealable and non-appealable
denials of summary judgment is blurred.
    Cases are clear enough at the extremes.  We know, for
instance, that when a motion for summary judgment that asserts
qualified immunity is rejected, the denial cannot ground an
interlocutory appeal if the operative question is "whether or not
the pretrial record sets forth a genuine issue of fact for trial."  
Johnson v. Jones, 515 U.S. 304, 320 (1995).  Similarly, we know
that the denial of such a motion is immediately appealable if the
operative question is purely legal in nature.  See id. at 319.  In
fine, "a summary judgment order which determines that the pretrial
record sets forth a genuine issue of fact, as distinguished from an
order that determines whether certain given facts demonstrate,
under clearly established law, a violation of some federally
protected right, is not reviewable on demand."  Stella v. Kelley,
63 F.3d 71, 74 (1st Cir. 1995); accord Behrens v. Pelletier, 516
U.S. 299, 306 (1996).
    Determining the existence vel non of appellate
jurisdiction in cases closer to the equator is more difficult.  
Some examples may be useful.  In Diaz, we determined that we lacked
jurisdiction to entertain an interlocutory appeal from a pretrial
decision denying qualified immunity because the decision turned on
the existence of a factual conflict or on what the lower court
perceived to be a factual conflict.  112 F.3d at 4-5.   This
contrasts with situations in which the district court assumes a set
of facts and decides, as a matter of law, that those facts will not
support a qualified immunity defense   in which event jurisdiction
exists to entertain an immediate appeal.  See Behrens, 516 U.S. at
313.
    If this were not complex enough, the district judge is
not legally obliged to explain the basis on which a denial of
summary judgment rests.  See Johnson, 515 U.S. at 319
(acknowledging that "[d]istrict judges may simply deny summary
judgment motions without indicating their reasons for doing so");
Domegan v. Fair, 859 F.2d 1059, 1065-66 (1st Cir. 1988) (similar).  
When the district court's order is unilluminating, the appellate
court must fend for itself.  Anticipating the dilemma that such an
inscrutable order may pose in the qualified immunity context, the
Court prophesied "that a court of appeals may have to undertake a
cumbersome review of the record to determine what facts the
district court, in the light most favorable to the nonmoving party,
likely assumed."  Johnson, 515 U.S. at 319.  Hence, we must perform
the equivalent of an archeological dig and endeavor to reconstruct
the probable basis for the district court's decision.
    Here, the district court denied the appellants' motions
for summary judgment before the plaintiff filed oppositions to
several of those motions.  As a result of this hastiness, the data
before the court were limited   and limited further by the
appellants' apparent intransigence in furnishing discovery.  
Withal, the district court had before it a great deal of
information from sources such as the psychiatrists' summary
judgment papers, the plaintiff's opposition to the psychiatrists'
motion, and evidentiary materials submitted by a former codefendant
in connection with an earlier summary judgment motion.  The court
also had before it all the appellants' moving papers (which contain
more than a smidgen of intramural fingerpointing).  The court was
at liberty to consult all these sources, and we, too, can consult
them in endeavoring to determine whether the court below based its
decision on contested facts as opposed to a quintessentially legal
judgment.
                     C.  A Note of Caution.
    Having performed the exercise described in Part III(B),
supra, we conclude, for reasons made manifest in our subsequent
discussion of the appellants' claims, that we have jurisdiction
over all these appeals and that the lower court appropriately
denied all four summary judgment motions.  We note, however, that
this endorsement of the district court's ruling has a somewhat
tentative cast.  We offer three pertinent observations.
    First, our approach assumes, despite the awkwardness of
the conceptual fit, that deliberate indifference cases are amenable
to standard qualified immunity analysis   a proposition that
logically may be debatable, but that nevertheless follows from the
Supreme Court's broad pronouncements.  See, e.g., Harlow, 457 U.S.
at 819.  Second, a pretrial refusal to grant qualified immunity is
only a way station in the travel of a case.  When a defendant fails
on a pretrial qualified immunity claim, he nonetheless can plead
qualified immunity as an affirmative defense and resurrect the
claim at trial.  See Ringuette, ___ F.3d at ___ [slip op. at 6];
King v. Macri, 993 F.2d 294, 299 (2d Cir. 1993); Vazquez Rios v.
Hernandez-Colon, 819 F.2d 319, 329 (1st Cir. 1987).  Third,
notwithstanding a pretrial rejection of qualified immunity, the
merits remain open.
IV.  THE PSYCHIATRISTS
    The plaintiff alleges that the psychiatrists, Drs. Hoyos
and Rivera-Gonzalez, evaluated Diaz-Martinez on February 28, 1994,
with complete indifference to the constitutional rights of others
and recklessly declared him fit for duty and able to carry a
weapon.  The psychiatrists' joint summary judgment motion addressed
this claim on two levels, positing that they enjoy (1) absolute
immunity from suit under Puerto Rico law, and (2) qualified
immunity from suit under federal law because their performance was
objectively reasonable and, in any event, had no direct bearing on
the decision to restore an armed Diaz-Martinez to active duty.  We
grapple with these asseverations in sequence.

                     A.  Absolute Immunity.
    A district court's refusal to grant summary judgment on
an absolute immunity claim is, generally speaking, within the scope
of our appellate jurisdiction on interlocutory appeal.  SeeAcevedo-Cordero v. Cordero-Santiago, 958 F.2d 20, 21 (1st Cir.
1992).  In this instance, it invokes the Puerto Rico Medico-
Hospital Professional Liability Insurance Act, which provides in
pertinent part:
    No health service professional may be included
    as a defendant in a civil suit for damages due
    to malpractice caused in the performance of
    his/her profession while said health service
    professional acts in compliance with his
    duties and functions as an employee of the
    Commonwealth of Puerto Rico, its dependencies,
    instrumentalities and municipalities.

P.R. Laws Ann. tit. 26,  4105 (1994).  The psychiatrists contend
that this statute immunizes them because they examined Diaz-
Martinez pursuant to the terms of a contract purporting to free
them from liability under section 4105 (incorrectly identified as
section 5105).  We do not agree.
    In the first place, the statute on its face applies to
"employees."  The contract states that the psychiatrists are
independent contractors, not employees, and the record at the very
least raises unanswered factual questions anent the statute's
applicability.  See, e.g., Flores Roman v. Ramos-Gonzalez, 127 P.R.
Dec. 601, 608-09 (P.R. 1990) (examining the relevant contract to
determine whether a given defendant is an employee or independent
contractor); see also Nieves v. University of P.R., 7 F.3d 270, 273
(1st Cir. 1993) (discussing section 4105).
    In the second place, even if section 4105 applies, it at
most gives government-employed physicians immunity from claims
brought under Puerto Rico law.  A state-conferred immunity cannot
shield a state actor from liability under section 1983.  SeeMartinez v. California, 444 U.S. 277, 284 n.8 (1980) ("Conduct by
persons acting under color of state law which is wrongful under 42
U.S.C.  1983 . . . cannot be immunized by state law.") (quoting
Hampton v. City of Chicago, 484 F.2d 602, 607 (7th Cir. 1973)).  
Indeed, a regime that allowed a state immunity defense to trump the
imposition of liability under section 1983 would emasculate the
federal statute.  See id.  We therefore reject the proposition that
absolute immunity entitled the psychiatrists to summary judgment.
                    B.  Qualified Immunity.
    Before confronting the psychiatrists' qualified immunity
defense, we make a preliminary point.  The psychiatrists are
private practitioners, not government employees in the traditional
sense.  Consequently, one might wonder whether they could be liable
at all under section 1983, or, if so, whether they would be
entitled to qualified immunity even on a "best case" scenario.  The
answer to both questions is in the affirmative.
    A private party's conduct is attributable to the state if
the state "has so far insinuated itself into a position of
interdependence with [the private party] that it must be recognized
as a joint participant in the challenged activity."  Barrios-
Velazquez v. Asociacin de Empleados del Estado Libre Asociado, 84
F.3d 487, 494 (1st Cir. 1996) (citation and internal quotation
marks omitted; alteration in the original).  Here, the
psychiatrists acted under contract with the police department to
assist in a necessary departmental function:  the evaluation of
officers.  Hence, the psychiatrists, virtually by their own
admission (see supra Part IV(A)), are for purposes of this case
state actors performing in concert with the department.  As such,
they are both subject to suit under section 1983 and eligible for
the balm of qualified immunity.  See Rodriques v. Furtado, 950 F.2d
805, 814 (1st Cir. 1991) (extending qualified immunity to a
physician who agreed to assist the police in a body cavity search).
    That said, the psychiatrists' pretrial case for qualified
immunity lacks force.  First, perscrutation of the record discloses
uncontested facts sufficient to permit us to exercise jurisdiction
over their appeal.  Second, those facts, construed favorably to
Camilo-Robles, adequately ground a tripartite conclusion (1) that
Diaz-Martinez posed an unusually serious risk of harm, (2) that the
psychiatrists had actual knowledge of the risk, and (3) that they
failed to take readily apparent steps to alleviate that risk.  
Third, the assumed set of facts presented here reveals a reckless
disregard for the rights of others that outstrips any band of
protection afforded by the doctrine of qualified immunity in cases
of deliberately indifferent conduct.
    We see no need to differentiate between the two
psychiatrists for present purposes; after all, they themselves have
abjured such a course and presented a united front both below and
on appeal.  By like token, it seems unnecessary to rehearse all the
facts that contribute to our conclusions.  Instead, we offer a
sampling.
         The psychiatrists approached the February
         1994 evaluation with abundant
         foreknowledge of Diaz-Martinez's case,
         gleaned from their August 1993 evaluation
         of him and their ensuing certification
         that he was fit for active duty at that
         time.

         On September 1, 1993, a few days after
         they  issued the August 1993
         certification, the psychiatrists received
         a psychologist's report (the Sedra
         Report), dated July 14, 1993, which noted
         that Diaz-Martinez denied reality, that
         he was immature, impulsive, and anxious,
         and that "his tension level could make
         him . . . act[] out."  Dr. Sedra later
         described this last observation as
         equivalent to saying that  Diaz-Martinez
         "could explode at any time."  Despite
         receiving this report, the psychiatrists
         did not revisit their original
         certification of Diaz-Martinez as fit for
         duty, and seem to have ignored the Sedra
         Report during the February 1994
         examination.

         On September 8, 1993, Diaz-Martinez shot
         two innocent civilians, thus confirming
         Dr. Sedra's warnings.  Still, the
         psychiatrists (both of whom knew of that
         incident) nonetheless recertified Diaz
         Martinez for rearming and active duty in
         February 1994 without an intervening
         psychological evaluation.

         To administer their government contract,
         the psychiatrists set up a system whereby
         each doctor would independently interview
         each referred officer, thus ensuring two
         detached opinions.  Although the
         psychiatrists knew Diaz-Martinez's
         stunning history of violence, they  
         nonetheless deviated from this protocol
         in their February 1994 evaluation.  
         Indeed, their entire examination
         consisted of one joint interview.

         After conducting their joint interview,
         the psychiatrists declared Diaz-Martinez
         "fit to engage in all of the duties
         inherent to a law enforcement agent . . .
         (including the use of a regulation
         weapon)," without carrying out any
         further investigation.

         By his own admission, Dr. Hoyos neglected
         to read the Caldern Report (which
         detailed numerous instances of Diaz-
         Martinez's aberrant behavior) before
         signing off on Diaz-Martinez's status.  
         Dr. Rivera-Gonzalez, who did read the
         Caldern Report, brushed it aside as
         insufficient to warrant further
         investigation.

         There is no evidence to suggest that the
         psychiatrists  requested or consulted
         Diaz-Martinez's current complaint history
         before they gave him a clean bill of
         health in February 1994.

    The presence of these essentially uncontested facts
strongly suggests that the district court denied the psychiatrists'
motion for summary judgment as a matter of law.  We therefore have
appellate jurisdiction.  See Behrens, 516 U.S. at 313.
    Exercising that jurisdiction and reviewing the district
court's decision de novo, we believe that under at least one
plausible scenario depicted by these assumed facts   in which the
psychiatrists did not comply with their own evaluation protocol,
failed to credit or take seriously the psychologist's report, made
only a cursory effort to gather relevant data, and virtually
ignored the information that did come to their attention   the
psychiatrists carried out an objectively unreasonable course of
conduct.
    Of course, the psychiatrists have a fallback position:  
they maintain that their conduct (whether or not objectively
reasonable) did not cause harm to Camilo-Robles because they
functioned merely as advisors and did not themselves make the
decision to return a fully armed Diaz-Martinez to the streets.  
This contention is better suited to a discussion of the merits, but
to the extent that some causal connection is necessary to find that
a state actor has failed the test of objective legal
reasonableness, that nexus exists here.
    To be sure, the psychiatrists did not have official
authority to rearm Diaz-Martinez and restore him to active duty.  
Nonetheless, the summary judgment record makes it pellucid that the
psychiatrists knew that their certification of Diaz-Martinez would,
in Dr. Hoyos's phrase, "most probably" result in the officer's
immediate rearming and return to active duty   as it had in every
other previous instance.  The police superintendent likewise
attested to the significance of the psychiatrists' role.  According
to him, once the examining psychiatrist "certifies in writing that
[an officer] is authorized to bear arms . . . we proceed to give
back the weapon."  Then, too, the director of the Bayamon CIC
stated that the psychiatrists   not the police hierarchy   made the
decision to rearm Diaz-Martinez.  Finally, the record permits a
reasonable inference that the psychiatrists eschewed easily
accessible steps to forestall the rearming of Diaz-Martinez and
instead certified his fitness for unrestricted active duty.  
Because this is an adequate showing of causation to support a
denial of qualified immunity, the psychiatrists' fallback position
avails them naught.
V.  THE REMAINING APPELLANTS
    The plaintiff alleges that the remaining three appellants
have supervisory liability under section 1983 for their individual
failures to keep Diaz-Martinez unarmed and away from the public.  
The affected appellants unanimously deny this averment.  Their
separate summary judgment motions maintain that, at the least,
qualified immunity attaches.  Consequently, we troll the record in
search of facts bearing on the putative immunity of each appellant.  
We then examine those collected facts to determine the basis of the
district court's decision (and, thus, the existence vel non of
appellate jurisdiction).  Lastly, we proceed to determine whether
the district court erred in rejecting the qualified immunity
defense.
                        A.  Diaz-Pagan.
    The summary judgment record reveals the following
uncontested facts concerning Diaz-Pagan.
         In January 1994, Diaz-Martinez joined the
         Bayamon CIC.  Throughout his tenure
         there, Diaz-Pagan served as the unit's
         director.

         As director, Diaz-Pagan had the authority
         to oversee and countermand his
         subordinates' staffing decisions and/or
         to dispatch police officers for special
         human relations training to minimize the
         likelihood of future outbursts.

         Diaz-Pagan also possessed the authority
         to ensure that Diaz-Martinez would remain
         in an administrative position, removed
         from public contact.

         By early 1994, Diaz-Pagan had read the
         Caldern Report and was aware of Diaz-
         Martinez's extensive history of violence,
         including the 1989 hostage-taking
         incident, a 1993 death threat against
         Diaz-Martinez's landlord, the September
         1993 shootings, and a very recent death
         threat against a fellow officer.  This
         compendium of incidents led Diaz-Pagan to
         advise the area commander, Col. Pablo
         Santiago-Gonzalez, that Diaz-Martinez
         "displays a pattern of behavior which
         requires special attention."

         Notwithstanding the foregoing, Diaz-Pagan
         neither recommended Diaz-Martinez for
         special human relations training nor
         intervened to assure that Diaz-Martinez's
         assignments would insulate him from
         public contact.

         Diaz-Pagan did not alert his subordinates
         who were in charge of day-to-day
         operations to the risk that he himself
         foresaw.

         Despite his foreknowledge of the imminent
         danger that rearming Diaz-Martinez
         entailed, Diaz-Pagan did not take any
         measures to influence whether Diaz-
         Martinez would be rearmed.

         Although he professed "surprise[]" when
         he learned (prior to the incident
         involving Camilo-Robles) that Diaz-
         Martinez's weapon had been restored,
         Diaz-Pagan acquiesced in that action and
         did not attempt to rescind it.

         When Diaz-Pagan left for vacation on
         April 18, 1994, he neglected to inform
         his temporary replacement, Capt. Jorge
         Hernandez-Colon, of Diaz-Martinez's
         disciplinary record.

                     B.  Santiago-Gonzalez.

    The summary judgment record reveals the following
uncontested facts concerning Santiago-Gonzalez.
         Santiago-Gonzalez served as Bayamon area
         commander during the time in question.

         Santiago-Gonzalez knew of Diaz-Martinez's
         violent history.  He had received the
         Caldern Report and had personally
         overseen the efforts to calm the affected
         neighborhood in the wake of the 1993
         double shooting.

         Diaz-Pagan identified Santiago-Gonzalez
         as his "boss" and as "the person who has
         control of the Area."  Thus, the chain-
         of-command observations set forth as to
         Diaz-Pagan apply with at least equal
         force to Santiago-Gonzalez.

         The superintendent of police testified
         that: "It is the discretion of the Area
         Commander [Santiago-Gonzalez] to assign
         [officers] to the different units."

         Santiago-Gonzalez enjoyed the discretion
         to assign Diaz-Martinez to desk duty or
         other administrative work, yet failed to
         use this power to make certain that the
         rogue officer would not come in contact
         with the public.

                       C.  Toledo-Davila.

    The summary judgment record reveals the following
uncontested facts concerning Toledo-Davila.
         Toledo-Davila served as police
         superintendent throughout the time in
         question.

         The police superintendent is the only
         person empowered to assign a regulation
         weapon to a member of the police force,
         and has plenary discretion to withhold or
         confiscate a weapon in those cases in
         which he deems such action appropriate.  
         See Puerto Rico Police Department
         Personnel Reg.  9.3(1)(a), (d).

         Toledo-Davila knew the details of Diaz-
         Martinez's violent record.  He also knew
         that the Puerto Rico Department of
         Justice had assumed control of the
         investigation into the September
         shootings, and that as of February 1994
         its investigation was ongoing.

         Toledo-Davila abdicated his duty to
         exercise  independent judgment in
         determining which officers should bear
         arms.  In that respect, he stated that
         once a psychiatrist certifies an officer
         as fit for duty, "the superiors are
         notified . . . [a]nd then we proceed to
         give back the weapon."

                  D.  Appellate Jurisdiction.

    After full consideration of the record, we believe that
the district court supportably assumed a set of documented facts
from which it denied the supervisors' motions for summary judgment
as a matter of law. Consequently, we have jurisdiction to review
the district court's decision.
    Our rationale is straightforward.  On the record as it
stands, the facts as to these appellants' powers, functions,
conduct, and omissions are not seriously disputed, nor are the
facts as to what corrective measures were available to them.  This
makes it very likely that the district court assumed the facts to
be as stated.  That the district court did not wait for the
plaintiff's opposition   a practice that we do not commend   
buttresses this conclusion and suggests that the court did not
believe it necessary for the plaintiff to adduce additional facts
because the facts that already were in the record, assumed as true
and interpreted favorably to the plaintiff, were insufficient as a
matter of law to warrant the application of qualified immunity.  
Thus, we turn to the correctness of that conclusion, again taking
the supervisors one by one.
              E.  Qualified Immunity   Diaz-Pagan.
    Diaz-Pagan trumpets that Diaz-Martinez was not under his
direct command, and that, in all events, he was on vacation when
Diaz-Martinez allegedly assaulted Camilo-Robles.  Based largely on
these undisputed facts, Diaz-Pagan maintains that he deserves
qualified immunity because there is no causal link between his
conduct and the assault on Camilo-Robles.
    This argument speaks less to qualified immunity and more
to the merits   and a denial of summary judgment on the merits,
even in a section 1983 case, is not immediately appealable.  SeeDomegan, 859 F.2d at 1061.  Still, a plausible causal chain is
relevant to the objective legal reasonableness of a state actor's
conduct and, viewed in that light, Diaz-Pagan's contentions are not
entirely off base.  At any rate, on the assumed set of facts the
court supportably could have concluded that Diaz-Martinez presented
a serious risk of harm and that Diaz-Pagan knew as much; put
another way, Diaz-Pagan "was put on notice of behavior which was
likely to result in the violation of the constitutional rights of
citizens."  Febus-Rodriguez, 14 F.3d at 93.  The court likewise
could have concluded that Diaz-Pagan had the authority to prevent
recurrences of Diaz-Martinez's erratic behavior, but nevertheless
failed to take obvious steps within his power to reduce or
eliminate that risk.  Similarly, the court could have found the
requisite causal connection.  Finally, the court could have
concluded that Diaz-Pagan's omission was outside the range of
mistaken judgments that the qualified immunity doctrine protects.  
Seen in that light, Diaz-Pagan's conduct was not objectively
reasonable and, thus, qualified immunity does not attach.
         F.  Qualified Immunity   Santiago-Gonzalez.   
    Santiago-Gonzalez similarly claims qualified immunity on
the ground that the causal connection between his functions and
Diaz-Martinez's transgressions is too attenuated to justify the
imposition of section 1983 liability.  As above, we examine
causation insofar as it bears on qualified immunity (i.e., as an
element of objective legal reasonableness).
    On the facts proffered by Santiago-Gonzalez and amplified
elsewhere in the record, it is plain that Santiago-Gonzalez knew
that Diaz-Martinez was a ticking time bomb and also knew (or should
have known) that Diaz-Martinez, if restored to active duty, was
likely to commit acts that would violate the constitutional rights
of others.  As was true of Diaz-Pagan, Santiago-Gonzalez had both
the authority and the opportunity to prevent Diaz-Martinez from
interacting with the public, yet failed to intervene.  Accordingly,
his indifference and the assault on Camilo-Robles were causally
linked.  In a nutshell, on the assumed set of facts revealed by the
summary judgment record the district court supportably could
conclude that Santiago-Gonzalez acted in an objectively
unreasonable fashion, thus exempting his conduct from the
prophylaxis of qualified immunity.
            G.  Qualified Immunity   Toledo-Davila.
    At the end of the day, Toledo-Davila maintains that he
and the officers under his command followed proper police
procedures when rearming Diaz-Martinez.  He adds that in all events
he acted in good faith   and qualified immunity protects officers
who make good-faith mistakes.  See Anderson, 483 U.S. at 641.  
Although we find no evidence to suggest that Toledo-Davila (or the
other appellants, for that matter) acted in bad faith, we
nonetheless conclude that Toledo-Davila cannot wrap himself in the
mantle of qualified immunity.
    The extant record eloquently refutes Toledo-Davila's
assertion that his conduct was, as a matter of law, objectively
reasonable.  Toledo-Davila knew of Diaz-Martinez's vicious
propensities and the peril presented; he had the sole de jure
responsibility to authorize rearming; and yet he treated Diaz-
Martinez not as a dangerous sociopath, but as any other officer.  
To cinch matters, a causal relationship existed between Toledo-
Davila's conduct and the incident at the Bayamon Judicial Center.  
We think that the police superintendent's latitudinarian approach
in the face of Diaz-Martinez's patent instability was so far
outside the realm of reasonableness that it rendered him ineligible
for protection under the qualified immunity doctrine.

VI.  CONCLUSION
    We add an eschatocol of sorts.  This is a hard case, for
it does not readily fit the mold cast by the Court's precedents.  
We believe it is possible that the Court, when confronted with a
claim of qualified immunity in a deliberate indifference case, may
recognize the awkwardness of the fit and formulate a special set of
rules to cover such situations.  Until further guidance emerges,
however, we have little choice but to apply the existing qualified
immunity paradigm across the board.  We have endeavored to do so
here.
    We need go no further.  Qualified immunity protects "all
but the plainly incompetent or those who knowingly violate the
law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  In this case,
none of the appellants consciously chose to violate the law.  If
the assumed facts indicated that they were merely inattentive or
careless, then qualified immunity would shield them despite the
fact that Diaz-Martinez violated the plaintiff's clearly
established rights.  See, e.g., Ringuette, ___ F.3d at ___ [slip
op. at 12]; Brennan, 888 F.2d at 194.  Here, however, indulging
reasonable pro-plaintiff inferences, the record shows conduct on
the appellants' part that can best be described as reckless and
wanton   conduct that is emblematic of the plain incompetency to
which the Malley Court alluded.  The appellants' behavior is,
therefore, outside the wide band of mistaken police judgments that
the qualified immunity doctrine is intended to shield and the
appellants, to a man, are not entitled to summary judgment.

Affirmed.  Costs in favor of appellee.

</body>

</html>